**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **HELDER VLADIMIR LOVO,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:17-CV-00418-JFM** |
| **AMERICAN SUGAR REFINING, INC.,** *et al.* | |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF DEFENDANT
AMERICAN SUGAR REFINING, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Emmett F. McGee, Jr. (Federal Bar No. 08462)
Keith Hudolin (Federal Bar No. 13688)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, MD 21209
Telephone:(410) 415-2000
Facsimile: (410) 415-2001
emmett.mcgee@jacksonlewis.com
keith.hudolin@jacksonlewis.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

I.   STATEMENT OF THE CASE ................................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS ........................................................... 3

   A.   ASR And Its Baltimore Refinery. ................................................................... 3

   B.   Lovo's Prior Employment As An Exempt Supervisor ..................................... 3

   C.   Lovo's Employment With ASR ....................................................................... 3

   D.   Lovo Understood That He Was An Exempt Employee. .................................... 4

   E.   The Primary Duty of Process Supervisors, Including Lovo. ............................ 5

      1.   All Process Supervisors Are Responsible For Managing Their Assigned Areas Of Operation ................................................................................. 5

      2.   Lovo's Primary Duty as Process Supervisor for the Dock Operations ........................ 5

         a.   Lovo Managed Employees In The Dock Operations ............................................. 5

         b.   Lovo Had Discretion In Managing Dock Personnel To Meet The Dock Production Goal ............................................................................................. 7

         c.   Lovo Was Responsible For Ordering ILA Labor. ................................................. 9

         d.   Lovo Was Responsible For Quality Control ......................................................... 10

      3.   Lovo's Primary Duty As Process Supervisor For The Wash House And The Filter House ......................................................................................... 10

         a.   Lovo Managed Employees In The Wash House And Filter House ..................... 10

         b.   Lovo Conducted Daily Inspections Of The Wash House And Filter House To Supervise Those Operations. ................................................................. 11

         c.   Lovo Was Responsible For Quality Control ......................................................... 12

         d.   Lovo Had Responsibility For Staffing And Scheduling. ...................................... 14

      4.   Process Supervisors Set Their Own Work Schedule. ....................................... 14

      5.   Lovo Was Responsible For "Three Step" And "Five Step" Processes ....................... 15

      6.   Lovo Was Responsible For Safety ..................................................................... 16

      7.   Lovo Was Responsible For Personnel Management. ......................................... 17

      8.   Lovo Was Responsible For Labor Relations. .................................................... 19

III. SUMMARY JUDGMENT STANDARD .............................................................. 19

IV. ARGUMENT ......................................................................................................... 20

   A.   ASR Is Entitled To Summary Judgment On Lovo's FLSA And MWHL Claims, Because It Properly Classified Lovo As Exempt. .............................. 20

i

1. The FLSA And The MWHL Exempt Executive And Administrative Employees From Their Overtime Provisions. ........................................................................................ 20

2. Lovo Was An Exempt Executive Employee ................................................................ 22

    a. The Elements Of The Executive Employee Exemption ...................................... 22

    b. Lovo's Primary Duty Was Managing A Customarily Recognized Subdivision Of The Process Department. ...................................................................................... 22

    c. Lovo Regularly Directed The Work Of More Than Two Full-Time Employees. 24

    d. Lovo Had The Authority To Hire Employees And His Suggestions And Recommendations As To The Firing, Advancement, Promotion, And Other Changes of Status Of Other Employees Were Given Particular Weight. ............. 25

    e. Numerous Courts Around The Country Have Found Supervisors With Similar Duties To Be Exempt Executives. ...................................................................... 27

3. Lovo Also Qualified As An Exempt Administrative Employee. .............................. 27

    a. The Elements Of The Administrative Employee Exemption .............................. 27

    b. Lovo's Primary Duty Was The Performance Of Non-Manual Work Directly Related To the Management And General Business Operations of ASR. ............ 28

    c. Lovo's Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance. ......................................... 31

B. ASR Is Entitled To Summary Judgment On Lovo's MWPCL Claim. ........................... 34

    1. ASR Did Not Unlawfully Withhold Wages, Because It Properly Classified Lovo As Exempt. ..................................................................................................................... 34

    2. Treble Damages Under The MWPCL Are Unavailable To Lovo. ............................ 34

V. CONCLUSION ................................................................................................................. 35

Defendant American Sugar Refining, Inc. ("ASR") submits this Memorandum in support of its Motion for Summary Judgment.

## I.   <u>STATEMENT OF THE CASE</u>

ASR classifies Process Supervisors at the sugar refinery it operates in Baltimore, Maryland (the "Baltimore Refinery") as exempt from overtime under the Fair Labor Standards Act ("FLSA") and the Maryland Wage and Hour Law ("MWHL"), based on the administrative and executive employee exemptions. Process Supervisors play a critical role in managing the Process Department where ASR employees unload raw sugar from ships and convert it into finished sugar products that are ready for packaging. They are responsible for one or more of five distinct areas of operation in the Process Department, where they are tasked with, among other things, meeting production goals by managing a workforce of hourly operators and longshoremen.

To meet ASR's productions goals, Process Supervisors have broad discretion in how they manage their assigned areas of operation. For example, they balance safety and maintenance concerns against production goals to determine which equipment to run at any given time. They direct employees to make adjustments to the refining process to ensure that the finished product satisfies quality control standards. They train on and enforce safety policies and procedures. They make adjustments to the schedules of the hourly workers, including scheduling overtime hours, to meet production goals. And, when they determine that it is appropriate, they issue discipline to employees under their supervision. Under ASR's progressive discipline process, any discipline they issue could ultimately lead to employees being suspended or terminated.

This is the role that Plaintiff, Helder Vladimir Lovo ("Lovo"), held throughout his employment with ASR. For most of his employment, he was responsible for managing the dock operations, where he ensured that ASR hired adequate numbers of longshoremen each day and supervised and directed the work of equipment operators and longshoremen as they unloaded raw

sugar from ships docked at the Baltimore Refinery. He also spent a portion of his employment with ASR inside the Baltimore Refinery, where he supervised and directed the work of operators in the "Wash House" and the "Filter House." ASR paid Lovo an annual salary in excess of $70,000 for this work, but he claims in this lawsuit that he deserved more.

Lovo's claims under the FLSA and MWHL fail because he was exempt from overtime requirements under the executive and administrative employee exemptions. The executive employee exemption applies because, among other reasons, (1) ASR paid Lovo on a salary basis well in excess of $455 per week; (2) it is undisputed that Lovo's primary duty was management of recognized subdivisions of the Process Department (namely, the dock operations, the Wash House, and the Filter House); (3) it is undisputed that he customarily and regularly directed the work of more than two full-time operators and longshoremen; and (4) the undisputed facts show that he had the authority to determine how many longshoremen ASR would hire each day, to issue discipline that could ultimately result in termination, and to determine whether new employees could continue in their positions after their initial training periods. The administrative employee exemption also applies because (1) ASR paid Lovo on a salary basis well in excess of $455 per week; (2) the undisputed facts show that Lovo's primary duty was management, rather than performing manual labor; and (3) the undisputed facts show that on a daily basis Lovo exercised significant discretion and independent judgment on matters of significance in a variety of areas, including personnel management, quality control, safety and health, and labor relations.

Accordingly, because ASR properly classified Lovo as exempt from the overtime requirements under the FLSA and the MWHL, his claims under those statutes fail. His claim under the Maryland Wage Payment and Collection Law ("MWPCL") fails for the related reason that ASR paid him all of the wages to which he was entitled. Therefore, and as described more fully

below, the Court should grant summary judgment in favor of ASR on each of Lovo's claims.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   ASR And Its Baltimore Refinery.

ASR refines and sells branded and private label sugars, sweeteners and syrups in the grocery, food service, industrial, and pharmaceutical channels. (Declaration of Kelly DeAngelo ("DeAngelo Decl."), attached as Appendix A, ¶ 3.) ASR operates a major sugar refinery located on Key Highway in Baltimore, Maryland (the "Baltimore Refinery"), which many people know for its distinctive "Domino Sugars" sign in the Baltimore harbor. (DeAngelo Decl. ¶ 4.) At the Baltimore Refinery, ASR discharges raw sugar from ships and processes that raw sugar into refined sugar products, such as granulated sugar, confectioner's sugar, and brown sugar. (DeAngelo Decl. ¶ 5.) Many of these products are sold under the Domino brand. (DeAngelo Decl. ¶ 5.) ASR divides its operations at the Baltimore Refinery into five departments: Process, Packaging, Warehouse, Bulk Loading, and Engineering. (DeAngelo Decl. ¶ 6.)

### B.   Lovo's Prior Employment As An Exempt Supervisor

Prior to being hired by ASR, Lovo worked as a production supervisor for a food processing company, where he was classified as an exempt employee and paid a $65,000 annual salary. (Deposition of Plaintiff, Helder Vladimir Lovo ("Lovo Dep."), excerpts attached as Appendix B, at 69:15-73:21.) He worked more than forty hours a week, but he understood that, as a salaried supervisor, he was not eligible to be paid extra for overtime. (Lovo Dep.75:10-12, 76:6-11.) Prior to that job, he worked as a supervisor for a produce company where he was paid a $45,000 annual salary and similarly was classified as an exempt employee. (Lovo Dep. 76:12-78:7.)

### C.   Lovo's Employment With ASR

ASR employed Lovo as a Process Supervisor in the Process Department at the Baltimore Refinery from September 28, 2015, to November 24, 2017. (Lovo Dep. 18:5-13, 55:10-56:8;

3

Declaration of Michael Moore ("Moore Decl."), attached as Appendix C, ¶ 3.) On November 24, 2017, Lovo resigned without notice to take a job at another company. (Moore Decl. ¶ 10.)

Processing at the Baltimore Refinery is composed of five different areas of operation: (1) the dock operations where raw sugar is unloaded from ships and transported via conveyor belts to a storage shed; (2) the Wash House, where centrifuges and other machines remove impurities and color from raw sugar; (3) the Filter House, where sugar is run through an ion exchange process and carbon filters to further remove color and other impurities; (4) the Pan House, where sugar is further filtered, recrystallized, and sent to driers; and (5) a specialty products operation, where sugar is refined for use in the pharmaceutical industry and other specialized applications. (Lovo Dep. 148:12-149:12, 154:14-19; DeAngelo Decl. ¶¶ 7-12.)

A Process Supervisor typically manages one or more of these distinct operations within the Process Department, and typically only one Process Supervisor is on duty in his or her assigned operation on any given shift. (DeAngelo Decl. ¶ 15.) From September 2015 to December 2016, Lovo was the Process Supervisor responsible for the dock operations, and from December 2016 until he resigned in November 2017, he was the Process Supervisor responsible for both the Wash House and Filter House. (Lovo Dep.16:17-20, 88:7-10, 148:3-8; DeAngelo Decl. ¶ 16.)

As a Process Supervisor, Lovo reported to the Process Manager, who in turn reported to the Refinery Manager. (Lovo Dep. 87:5-13 DeAngelo Decl. ¶¶ 13-14.) Initially the Process Manager was Coricka White, but beginning in June 2016, Defendant Ryan Wooters ("Wooters") took over as Process Manager. (Lovo Dep. 87:5-9, 92:21-93:11; DeAngelo Decl. ¶ 13.)

### D.     Lovo Understood That He Was An Exempt Employee.

ASR paid Lovo on a salary basis. (Lovo Dep. 51:11-16; Moore Decl. ¶ 5.) ASR intends for Process Supervisors' salaries to compensate them for all hours worked each workweek, regardless of whether they work more or fewer than 40 hours. (Moore Decl. ¶ 5.) At ASR, Lovo received a

substantial salary increase over what prior companies paid him as a supervisor. His initial salary at ASR was $72,000 and, in January 2017, ASR increased his salary to $73,400. (Lovo Dep. 51:17-52:2, 85:20-86:9; Moore Decl. ¶ 6; Deposition of Michael Moore ("Moore Dep."), excerpts attached as Appendix D, at 38:11-15.) When Lovo accepted the Process Supervisor position at ASR, he understood that he was an exempt employee, that ASR would pay him on a salary basis, and that he was not eligible to be paid extra for working overtime. (Lovo Dep. 67:15-69:14.) Prior to this lawsuit, Lovo never questioned his classification as an exempt employee and never claimed that he should be paid extra for working overtime. (Lovo Dep. 52:10-14, 65:13-67:14.)

### E.      The Primary Duty of Process Supervisors, Including Lovo.

#### 1.      All Process Supervisors Are Responsible For Managing Their Assigned Areas Of Operation.

The Job Description applicable to all Process Supervisor positions at the Baltimore Refinery states that "[t]his position is responsible for management of unionized workers in the manufacture of food products (sugar)." (Moore Decl. Ex. 1.) It identifies "key responsibilities" as "direct[ing] sugar refining operations on a designated shift"; "direct[ing] teams of specialized employees ensuring good manufacturing practices, GMP and safe operating procedures"; "achiev[ing] standard production volume, quality standards, and regulatory compliance through the supervision of hourly personnel (up to 30) on rotating shifts." (Moore Decl. Ex. 1.) As Lovo described it, his job was to "supervise the entire operation." (*See* Resume of Helder Vladimir Lovo, attached as Appendix E; DeAngelo Decl. ¶ 23.)

#### 2.      Lovo's Primary Duty as Process Supervisor for the Dock Operations.

##### a.      Lovo Managed Employees In The Dock Operations.

From September 2015 to December 2016, Lovo was the Process Supervisor responsible for the dock operations. (Lovo Dep. 16:17-20, 88:7-10; DeAngelo Decl. ¶ 16.) Ships containing

tons of raw sugar docked at the Baltimore Refinery, and Lovo managed the discharge process, which involved using cranes and other heavy equipment to unload the raw sugar from ships' cargo holds and to get it into the storage shed. (Lovo Dep. 88:11-19, 89:18-90:4.) Lovo described his primary duty as the Process Supervisor for the dock operations to include: "Supervis[ing] the discharge operation of bulk ships and barges;" "plan[ing] the discharge operation per storage plan;" "Supervis[ing] two different labor unions including ILA (Longshoreman);" and "Schedul[ing] work force for the entire operation, including weekend." (Appendix E.)

Lovo was one of two Process Supervisors responsible for the dock operations. (Lovo Dep. 18:14-18.) He generally worked 9:00 a.m. to 5:00 p.m., and the other Supervisor worked 5:00 a.m. to 1:00 p.m. (Lovo Dep. 22:6-23: 3.) So from 1:00 p.m. to 5:00 p.m., Lovo had sole responsibility for dock operations. (Lovo Dep. 23:4-10.) And because the other Supervisor frequently was on leave for medical reasons, sometimes for more than a month at a time, Lovo ran the dock operations by himself more frequently than that. (Lovo Dep. 19:3-20:3, 21:7-10.) Lovo did so with little direct oversight, because the Process Manager was rarely on the dock. (Lovo Dep. 286:1-3.)

Lovo was responsible for monitoring and directing the work of approximately seventeen to twenty employees. (DeAngelo Decl. ¶ 26.) That included five full-time operators who operated the large cranes and related equipment. (Lovo Dep. 87:21-88:10, 90:12-18, 111:13-20; DeAngelo Decl. ¶ 26; Moore Decl. ¶ 7.) It also typically included twelve to fifteen longshoreman who worked inside the holds of the ships and operated bulldozers and other equipment used to loosen the raw sugar so that it could be scooped out by the large cranes. (Lovo Dep. 90:19-91:13; DeAngelo Decl. ¶ 26; Moore Decl. ¶ 7.) Lovo, like other Process Supervisors, was designated as a "supervisor" for purposes of the National Labor Relations Act. (Moore Decl. ¶ 7.)

Lovo was not responsible for personally operating equipment, digging sugar, or engaging

in similar work on the dock. (DeAngelo Decl. ¶ 39.) In fact, the collective bargaining agreement ("CBA") with the United Food and Commercial Workers Union ("UFCW") that applies to the operators mandates that "[s]upervisory employees shall not perform the work normally performed by employees covered by this Agreement, except as is required in the training of employees, normal supervisory inspection, in emergency situations where a qualified employee cannot be made available in time, and in minimal situations of very short duration." (DeAngelo Decl. ¶ 39.) The two CBAs with the International Longshoremen's Association ("ILA") similarly state that "bargaining unit work shall only be performed by bargaining unit employees" and "[m]anagement will not perform work under the jurisdiction of Local 333." (DeAngelo Decl. ¶ 39.)

> **b.**    **Lovo Had Discretion In Managing Dock Personnel To Meet The Dock Production Goal.**

Lovo was responsible for managing the dock operations to meet the production goal of discharging from the ships a daily average of eight million pounds of raw sugar. (Lovo Dep. 260:1-261:18.) He had significant discretion in how to manage personnel and equipment to reach that target and made numerous judgment calls on a daily basis. (DeAngelo Decl. ¶ 24.)

For example, he had discretion to change the scheduling of the dock operations. (DeAngelo Decl. ¶¶ 28.) Wooters would say to Lovo: "I don't care whether you start early or stay late," provided you meet the goal. (Lovo Dep. 105:14-106:20.) Although the CBAs did not always allow Lovo to insist that particular employees stay late or start early, Lovo could "talk to the guys" and "[m]ost of the time the guys, some, some will volunteer, some don't." (Lovo Dep. 105:14-106:20.)

Another judgment call to be made is when to complete the discharge of one ship and to start discharging another. (DeAngelo Decl. ¶ 28.) That decision is a matter of discretion and can take into account a variety of factors, including the expected discharge rate, the need for raw sugar inside the refinery, and the schedule of ships coming to the refinery. (DeAngelo Decl. ¶ 28.)

Another important factor is whether ASR will incur "demurrage" fees if slower-than-expected discharge rates keep a ship at its dock longer than originally anticipated. (DeAngelo Decl. ¶ 28.) As the Process Supervisor for the dock operations, Lovo made those decisions or at least made recommendations. (DeAngelo Decl. ¶ 28.) For example, Lovo effectively overruled the tentative decision of the Process Manager and started discharging a ship on a Monday, rather than on Sunday as the Process Manager had recommended. (Lovo Dep. 106:21-110:13.)

The Process Supervisor is also responsible for making decisions as to how to discharge the ship to, among other things, achieve the maximum discharge rate. (DeAngelo Decl. ¶¶ 27, 32-33.) For example, the Process Supervisor on the dock determines and makes recommendations to each ship's captain with respect to which cargo hold to dig from first and when to move the vessel on the dock to allow the cranes to access different holds. (DeAngelo Decl. ¶ 31.) The Process Supervisor also decides when to "free dig" with the crane without the assistance of longshoremen and when to put longshoremen and bulldozers into a ship's hold to assist. (DeAngelo Decl. ¶ 27.)

Another judgment call to be made is when to slow down or stop operations on the dock to allow for maintenance work on equipment and when to defer maintenance to a later date. (DeAngelo Decl. ¶¶ 34-35.) This involves a judgment call based on factors such as the severity of the maintenance issue (*e.g.*, whether equipment can still run, despite the issue), safety concerns associated with continuing to run the equipment, whether the dock operations are currently meeting their production goals, and the upcoming schedule of the dock. (DeAngelo Decl. ¶¶ 34-35.) For example, a Process Supervisor might defer maintenance on a bulldozer that can still operate if the Process Supervisor knows that there will soon be a day on which no ships are scheduled to be at the dock. (DeAngelo Decl. ¶¶ 34-35.) Likewise, a Process Supervisor might slow down the flow of sugar if, for example, foreign objects in the raw sugar have the potential to

8

damage the conveyor belts used to transport it to the storage shed. (DeAngelo Decl. ¶ 33.) Or a Process Supervisor might speed up the flow of sugar through the cranes if a ship has on it high quality sugar, as Lovo did in November 2017. (DeAngelo Decl. ¶ 33.)

Yet another example of a judgment call is the placement of raw sugar in the storage shed. (DeAngelo Decl. ¶ 31.) Sugar quality varies based on the source of the sugar and the time of year at which it is harvested. (DeAngelo Decl. ¶ 31.) Process Supervisors must determine the placement of differing sugars in the storage shed based on numerous factors, including the characteristics of the sugar already in the shed, the characteristics of the sugar being unloaded, the space available in the shed, the expected characteristics of sugar on ships to be unloaded in the near future, and the needs of other areas of operation in the Process Department. (DeAngelo Decl. ¶ 31.)

Lovo also was responsible for managing the sanitation program for the dock without adversely affecting the discharge rate. His duties included inspecting the operation and observing whether there were sanitation issues that needed to be addressed, and if so, Lovo assigned employees to clean the area. (Lovo Dep. 190:17-191:6.)

### c.     Lovo Was Responsible For Ordering ILA Labor.

Lovo's responsibilities for staffing the dock operations included requisitioning or ordering longshoremen from the ILA. (DeAngelo Decl. ¶¶ 40-41.) On a daily basis, Lovo ordered longshoremen based on his judgment of how many workers, or gangs, would be needed to perform the following day's work. (DeAngelo Decl. ¶ 41.) The judgment was based in part on where things stood in the process of unloading the ship, whether a ship was expected to be at the dock the following day, expected weather conditions, the amount of sugar he anticipated they would need to unload the following day, and the condition of the sugar in the hull. (Lovo Dep. 278:8-281:20.)

There are numerous examples of Lovo exercising his discretion and independent judgment to make a decision as to how many gangs to order on a particular day. (DeAngelo Decl. ¶ 41.) For

example, he informed the Process Manager that he would order two gangs, despite having only one hold remaining to unload on a ship, because he believed he could get two cranes digging in the hold at the same time and this would "help increase productivity." (DeAngelo Decl. ¶ 41.) As another example, he decided to order gangs for the following day, despite a 50% chance of snow, which potentially could have shut down operations. (DeAngelo Decl. ¶ 41.) As another example, the ILA locals were scheduled to be closed on a Sunday and a Monday, which required Lovo to place an order on the preceding Saturday for Sunday, Monday, and Tuesday. (DeAngelo Decl. ¶ 41.) This required Lovo to project the labor needs for all three days. (DeAngelo Decl. ¶ 41.)

### d.      Lovo Was Responsible For Quality Control.

As a Process Supervisor, Lovo was responsible for preparing a number of reports on a daily basis, including discharge reports, downtime reports, storm water inspection reports, and port logs. (Lovo Dep. 267:6-270:12.) ASR uses these reports, among other ways, to monitor its operations, ensure that its operations are running efficiently, and identify potential areas for improvement. (DeAngelo Decl. ¶ 44.) Lovo also was responsible for ensuring that employees under his supervision received a monthly quality assurance training. (Lovo Dep. 177:1-178:6.)

### 3.      Lovo's Primary Duty As Process Supervisor For The Wash House And The Filter House

### a.      Lovo Managed Employees In The Wash House And Filter House.

In approximately December 2016, Lovo assumed responsibility for different operations at the Baltimore refinery. He remained a Process Supervisor, but he was reassigned from the dock operations to the Wash House and Filter House. (Lovo Dep. 94:13-95:8, 148:3-8.)

As the Process Supervisor for those inside refinery operations, Lovo monitored and directed the work of approximately five full-time operators, each of whom performed a different role in the sugar refining process. (Lovo Dep. 95:9-96:14, 149:20-150:12, 325:6-326:4; DeAngelo

Decl. ¶ 47.) In describing his role, Lovo stated "I'm in charge of the Wash House" and admitted that he was the boss of the operators who worked there. (Lovo Dep. 144:16-21.) When Lovo was on duty he was the only supervisor with dedicated responsibility for the Wash House and Filter House, although there generally also was a "Unit One" supervisor on duty who oversaw the entire refinery processing operation. (Lovo Dep. 150:19-151:9; DeAngelo Decl. ¶ 17-19.)

Lovo described his primary duty in the Wash House and Filter House as follows: "I oversee the people. I work along with the operators and ultimately my goal or my main focus is trying to meet production standards that have been established by my boss." (Lovo Dep. 174:20-175:11.) The daily goal is a "melt" of 6.8 million pounds of sugar. (Lovo Dep. 133:9-134:2, 262:2-18.) It is the Process Supervisor's duty to make decisions and direct operators to take actions necessary to meet that goal. (DeAngelo Decl. ¶ 33.) If the operation is running behind schedule, it was Lovo's responsibility to make adjustments. (DeAngelo Decl. ¶ 45.) As Lovo testified, "that's when I have to do whatever I need to do in order to try to speed things up." (Lovo Dep. 131:11-17.)

It also was Lovo's duty to minimize sugar loss. (Lovo Dep. 178:13-18.) For example, Process Supervisors minimize the sugar loss and ensure compliance with environmental policies by determining when excessive "sweet water" cannot be controlled with ordinary procedures and sent for further refining, and instead must be sent to industrial waste water. (DeAngelo Decl. ¶ 56.)

### b.  Lovo Conducted Daily Inspections Of The Wash House And Filter House To Supervise Those Operations.

Lovo spent part of his day in the office, monitoring the status of the Wash House and Filter House operations on computer screens. (Lovo Dep. 218:3-11.) But he typically spent a substantial portion of his work day "on the floor." (Lovo Dep. 141:5-142:6.) Typically at the beginning of the shift, Lovo conducted a "walk through" of both the Wash House and Filter House, floor by floor. (Lovo Dep. 208:9-19.) He observed the operations and determined whether there were any issues

or problems that need to be addressed. (Lovo Dep. 210:19-213:2, 215:5-216:21.) He also would talk to his employees to assess of the status of the operations and determine whether there are any problems that needed to be addressed or adjustments that needed to be made. (Lovo Dep. 319:10-321:14.)

It took Lovo 45 minutes to an hour to inspect the Wash House, and approximately the same amount of time to inspect the Filter House. (Lovo Dep. 214:18-215:13.) As Lovo described his job, "I mean every day is different. No day is the same." (Lovo Dep. 143:11-19.) If he observed a problem, he had to decide how to address it. (Lovo Dep. 301:19-304:5.) He exercised his judgment whether to call a mechanic or someone else from another department, whether to call one of his employees to address the problem, whether to handle the matter himself, or whether to address the problem some other way. (Lovo Dep. 315:1-317:1, 317:2-321:3.) If there was a spill or overflow, it was Lovo's responsibility to determine the source of the spill and, where appropriate, create a maintenance requisition to send to the maintenance foreman. (Lovo Dep. 334:2-7.) Depending on the circumstances, Lovo's plan would involve moving employees around or requiring employees to work overtime. When Lovo's plan was to have his employees work overtime, his plan was implemented and his employees worked overtime. (Lovo Dep. 304:6-17.)

### c.  Lovo Was Responsible For Quality Control.

As part of their primary duty, Process Supervisors responsible for the Wash House and Filter House must make numerous decisions on a daily basis relating to quality control.

There are countless adjustments that Process Supervisors direct their operators to make to the refining process to ensure the quality of the resulting refined sugar. (DeAngelo Decl. ¶ 50.) For example, a Process Supervisor could adjust the density of the melted sugar, which is known as the "liquor," as it passes through filteres. (DeAngelo Decl. ¶ 50.) A higher density will run more slowly, but use less energy, while a lower density will run faster. (DeAngelo Decl. ¶ 50.) A Process

Supervisor also might adjust the amount of lime that is added to the liquor, the amount of water going into the centrifuges, or the length of time the sugar spends in the centrifuges. (DeAngelo Decl. ¶ 50.) A Process Supervisor must use his or her discretion and independent judgment to balance numerous factors when making these decisions. (DeAngelo Decl. ¶ 50.) Once the Process Supervisor has decided to make an adjustment, he or she typically will direct an operator to implement the change via the computer terminals at which the operators sit, and then the Process Supervisor will advise the Process Manager or a Process Superintendent. (DeAngelo Decl. ¶ 50.)

The Process Supervisor responsible for the Wash House also is responsible for determining the blend of sugars that will come out of the storage shed, with the goal of maintaining a consistent blend. (DeAngelo Decl. ¶ 51.) For example, a Process Supervisor might blend high quality sugar with low quality sugar, rather than blending it with middling quality sugar. (DeAngelo Decl. ¶ 51.)

The Process Supervisor for the Wash House and Filter House also has the authority to determine independently when maintenance can be deferred and when it must be performed immediately. (DeAngelo Decl. ¶ 52.) Process Supervisors must use their own independent judgment to make this determination, based on factors including production targets, severity of maintenance issues, safety concerns, and availability of maintenance staff. (DeAngelo Decl. ¶ 52; *see also* Declaration of Matthew Ryan Wooters ("Wooters Decl."), attached as Appendix F, ¶ 3.)

Similar to when he supervised the dock operations, as the Process Supervisor for the Wash House and Filter House, Lovo was responsible for ensuring that employees under his supervision received monthly quality assurance training. (Lovo Dep. 177:1-178:6.)

Process Supervisors have the authority to recommend and implement new policies and procedures in the refining operations. (Wooters Decl. ¶ 4.) For example, in recent years Process Supervisors have recommended and implemented changes to procedures aimed at reducing

paperwork. (Wooters Decl. ¶ 4.) In 2017, Lovo assisted with creating a new procedure for delivering bills of lading to the storeroom for payments to vendors. (Wooters Decl. ¶ 4.) This required him and the Process Supervisor with whom he worked to analyze the current bill of lading process, use their discretion and independent judgment to determine how it could be improved, and develop a new procedure to be used by ASR going forward. (Wooters Decl. ¶ 4.)

### d.      Lovo Had Responsibility For Staffing And Scheduling.

Lovo made judgments about whether and how to adjust the work schedule of his employees to meet production goals. For example, if production was behind schedule, Lovo could, and did, have his employees start work early, before the regular shift start time. (Lovo Dep. 283:9-284:6, 287:2-6.) When Lovo recommended starting early, the Process Manager never overruled him. (Lovo Dep. 284:7-11.) Lovo also had discretion to recommend that his employees work overtime. (Lovo Dep. 191:12-192:13.) And he had discretion to allow his employees to leave early, and he did so when, in his judgment, that would not compromise operational priorities. (Lovo Dep. 193:14-194:5.) He also had to respond to unexpected call-outs by employees. Lovo made such staffing adjustments two or three times per week. (Lovo Dep. 227:2-228:5; DeAngelo Decl. ¶ 68.)

### 4.      Process Supervisors Set Their Own Work Schedule.

Lovo and the other Process Supervisors set their own work schedules. (Wooters Decl. ¶ 5; Declaration of Coricka White ("White Decl."), attached as Appendix G, ¶ 5.) Early in Lovo's employment, when he and William Manning shared responsibility for supervising the dock operations, Lovo devised a new schedule for himself and Mr. Manning that reduced the number of hours each worked while ensuring adequate coverage of the dock operations. (White Decl. ¶ 5.) Later, when Lovo was supervising the Wash House and Filter House, the Process Supervisors jointly devised a schedule pursuant to which each Process Supervisor worked twelve-hour shifts for four consecutive days and then had four consecutive days off. (Lovo Dep. 152:1-153:3;

Wooters Decl. ¶ 5.) The refinery operated twenty-four hours a day, and Lovo rotated shifts working from 7:00 a.m. to 7:00 p.m. for four days, taking four days off, and then working from 7:00 p.m. to 7:00 a.m. when he returned to work. (Lovo Dep. 153:4-9.) If Lovo needed to take a day off, he coordinated with other supervisors to arrange coverage. (Lovo Dep. 265:1-11.) The Process Manager generally worked during the days, so when Lovo worked the night shift, there was no Process Manager on duty. (Lovo Dep. 153:13-154:6.) Process Supervisors also determine how they will spend their time on any given day; they do not have a set schedule of tasks they must perform during their shifts. (DeAngelo Decl. ¶ 25, 46.)

### 5. Lovo Was Responsible For "Three Step" And "Five Step" Processes.

Process Supervisors are responsible for conducting the "three step" process, which involves (1) identifying a problem in the operation, (2) analyzing and determining the cause or causes of the problem, and (3) making recommendations for solutions designed to ensure that the problem does not occur again. (Lovo Dep. 173:2-174:10, 291:7-13; DeAngelo Decl. ¶ 36, 53.)

Lovo acknowledges that it was his duty to make recommendations about how to respond to a problem and make sure that it did not happen again. (Lovo Dep. 188:6-17.) And Lovo actually did that on a number of occasions. (Lovo Dep. 186:20-188:3) For example, while working as a Process Supervisor in the dock operation, Lovo completed a three step process following an injury to an employee working under his supervision. (DeAngelo Decl. ¶ 37.) While supervising the Wash House and Filter House, Lovo completed a three step process when there was a leak of liquid lime and an employee trying to close a valve to stop the leak got lime in his eye. (DeAngelo Decl. ¶ 54.) ASR ultimately implemented Lovo's recommendation to install an eye wash station on the floor of the Wash House where the incident occurred. (DeAngelo Decl. ¶ 54.)

Five step processes are similar to the three step processes, but they are reserved for some of the most serious incidents that might occur. (DeAngelo Decl. ¶ 36, 53.) Although the five step

process involves more participants than the three step process, Process Supervisors still are responsible for overseeing the completion of the process, including making recommendations for avoiding similar incidents in the future. (DeAngelo Decl. ¶ 36, 53.) For example, when Lovo was responsible for the dock operations, he was identified as the "owner" of a five step process when a cable broke and a crane bucket fell onto and damaged a ship's deck. (DeAngelo Decl. ¶ 38.)

### 6. Lovo Was Responsible For Safety.

As a Process Supervisor, Lovo's primary duty also included "enforcing safety policies." (Appendix E; *see also* DeAngelo Decl. ¶ 57.) As Lovo testified in his deposition, "So, those are part of my duties too, making sure they're working safe and wearing the proper PPE [personal protective equipment]." (Lovo Dep. 137:6-8; *see also* Lovo Dep. 159:16-17: "I made sure people are working safe.") That involved observing employees performing their jobs, providing instruction, and preparing reports. (Lovo Dep. 166:1-168:8.)

Lovo, like all other Process Supervisors, was also responsible for "safety contacts." (Lovo Dep. 166:1-168:8.) A "safety contact" is where a Process Supervisor observes an employee performing a task and then instructs the employee as to what the employee could have done to perform the task more safely. (DeAngelo Decl. ¶ 58.) Although ASR requires Process Supervisors to complete at least one safety contact each month, Process Supervisors have complete discretion to decide when to conduct the safety contact, to choose the employee(s) with whom they will conduct the safety contact, to choose the focus of the safety contact, and to decide to conduct additional safety contacts. (DeAngelo Decl. ¶ 58.) Lovo, like all other Process Supervisors, also was responsible for conducting monthly trainings on topics that included safety. (DeAngelo Decl. ¶ 59.) Lovo determined the time and manner of these training sessions. (DeAngelo Decl. ¶ 59.)

Not only are Process Supervisors responsible for ensuring that their employees work in a safe manner, they also have authority to stop operations in part or all of the Baltimore Refinery if

a serious safety concern emerges. (DeAngelo Decl. ¶ 60.) There are no set protocols as to when they can do this. (DeAngelo Decl. ¶ 60.) If they determine, in their discretion, that continuing to operate would be unsafe, they are authorized to immediately stop operations and order the evacuation of part or all of the Baltimore Refinery. (DeAngelo Decl. ¶ 60.)

### 7. Lovo Was Responsible For Personnel Management.

In addition to the duties described above, Process Supervisors have many additional personnel management responsibilities in their assigned areas of operation.

For example, it was Lovo's job to monitor the job performance of the employees whom he supervised and ensure that they followed company policies and procedures. (Lovo Dep. 150:13-18, 146:2-15.) Lovo did that by inspecting the areas of the refinery that he was responsible for, which consisted of sixteen floors in two different buildings. (Lovo Dep. 142:4-6, 146:2-15.) "I walk around, I walk around their stations. If I see something that I don't think is, is properly done, I go on there and bring it up to their attention." (Lovo Dep. 139:20-140:5.)

ASR maintains a progressive discipline process that begins with coaching and verbal warnings. (Moore Dep. 41:13-19.) When Lovo observed violations of ASR's policies and procedures, he had discretion to issue discipline. (Lovo Dep. 138:17-140:5; Moore Dep. 41:10-12.) Repeated or severe violations by an employee could result in termination and, if that were to occur, Lovo was "expected to communicate that and make his recommendations." (Moore Dep. 40:1-7.) Many Process Supervisors have issued discipline and Lovo issued a warning to an employee under his supervision. (DeAngelo Decl. ¶ 63; Wooters Decl. ¶ 6.) Further, with respect to the dock operations, Process Supervisors have the authority to direct the ILA not to send particular longshoremen back to the Baltimore Refinery as part of future gangs ordered by ASR, effectively terminating their employment with ASR. (DeAngelo Decl. ¶ 30.)

Apart from longshoremen hired on a daily basis, job openings in the Process Department

typically are filled by employees from other departments who obtain the positions through an internal bid process. (DeAngelo Decl. ¶ 43.) If there are job openings that cannot be filled through the internal bid system, Process Supervisors would be involved in the hiring process by reviewing resumes, making recommendations as to which applicants to bring in for interviews, participating in interviews, and making recommendations as to which applicants to hire. (DeAngelo Decl. ¶ 43.) For example, when Wooters worked as a Process Supervisor, ASR hired two external candidates for positions in the Process Department and followed Wooters' recommendation as to which two employees to hire. (Wooters Decl. ¶ 7.)

Process Supervisors are also responsible for training and evaluating the performance of new employees in their assigned areas of operation. (DeAngelo Decl. ¶ 61.) Regardless of whether an employee comes to a position in the Process Department via an external hiring process or an internal bidding process, the Process Supervisor must evaluate the performance of the employee in his or her new position on a weekly basis for up to six weeks. (DeAngelo Decl. ¶ 61.) By the end of the six week training period, the Process Supervisor is responsible for recommending whether to qualify the employee for the position. (DeAngelo Decl. ¶ 61.) If an employee is determined to be unqualified at any time during or at the conclusion of the six week training period, the employee will not remain in the position. (DeAngelo Decl. ¶ 61; Wooters Decl. ¶ 9.)

Process Supervisors are also responsible for "help[ing] [ASR] determine whether or not we have the correct number of required employees within the department and his function achieve operational objectives." (Moore Dep. 39:13-17; DeAngelo Decl. ¶ 65.) They also have authority to recommend employees who work under their supervision for promotion to any vacant Process Supervisor positions. (DeAngelo Decl. ¶ 64.)

In addition, Process Supervisors have certain responsibilities with respect to payroll and

timekeeping. For example, both when he worked in the dock operations and when he worked in the Wash House and Filter House, Lovo was responsible for inputting the work schedule for operators under his supervision, and he also was responsible for monitoring those employees to make sure they accurately reported their work hours. (Lovo Dep. 287:10-288:16.) If one of those employees failed to clock out, Lovo was responsible for correcting the time records. (Lovo Dep. 288:17-289:15.) Likewise, when Lovo supervised the dock operation, he was responsible for tracking the hours worked by the ILA gangs to ensure that ASR paid them correctly for their time. (White Decl. ¶ 6.) Indeed, early in Lovo's tenure with ASR, he developed a spreadsheet to more efficiently track the hours worked by ILA gangs. (White Decl. ¶ 6.)

### 8. Lovo Was Responsible For Labor Relations.

As a Process Supervisor responsible for supervising a unionized workforce, Lovo also had responsibilities with respect to labor relations, including participating in union grievance hearings on behalf of ASR. (Moore Decl. ¶¶ 8-9.) For example, when he managed the dock operation, Lovo was responsible for communicating with the ILA to address any issues that might arise, such as disciplinary problems with individual longshoremen. (DeAngelo Decl. ¶ 30.) As another example, while Lovo supervised the dock, two ILA longshoremen under his supervision got into a fight. (Moore Decl. ¶ 8.) Lovo investigated the incident by speaking with witnesses and prepared a report in which he stated that "it was determined that both employees may not return or access the premises until further notice." (Moore Decl. ¶ 8.) Lovo subsequently attended and testified at a union grievance hearing related to this incident. Ultimately, and as a result of Lovo's investigation, it was determined that one of the two employees would not be permitted to return to ASR in the same capacity in which he had been working for ASR. (Moore Decl. ¶ 8; Moore Dep. 47:13-48:8.)

### III.   SUMMARY JUDGMENT STANDARD

District courts have an "affirmative obligation . . . to prevent 'factually unsupported claims

[or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 31, 323-24 (1986)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.   ARGUMENT

### A.   ASR Is Entitled To Summary Judgment On Lovo's FLSA And MWHL Claims, Because It Properly Classified Lovo As Exempt.

#### 1.   The FLSA And The MWHL Exempt Executive And Administrative Employees From Their Overtime Provisions.

Section 207(a) of the FLSA requires employers to pay overtime to non-exempt employees at a rate of at least one and one-half times their regular rate of pay for all hours worked in excess of forty per week. 29 U.S.C. § 207(a). Certain employees, however, are exempt from the FLSA's overtime pay requirements, including those who are "employed in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). *See also IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 291 (4th Cir. 2007). In passing the FLSA, Congress granted the U.S. Department of Labor with "broad authority to define and delimit" the scope of these exemptions, *Auer v. Robbins,* 519 U.S. 452, 456 (1997), and the Department of Labor has done so. *See* 29 C.F.R. § 541.0 *et seq.* The determination of whether an employee is exempt from the overtime provisions of the FLSA ultimately is a question of law. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The MWHL also requires employers to "pay an overtime wage of at least 1.5 times the usual hourly wage." Md. Code, Lab. & Empl. § 3-415(a). Like the FLSA, the MWHL does not apply to any individual who is employed in an administrative, executive, or professional capacity. Md. Code, Lab. & Empl. §3-403(1). Maryland regulations define the terms administrative, executive, and professional to have the meanings provided in the federal regulations interpreting the FLSA. *See* COMAR 09.12.41.00 *et seq.* Accordingly, "Plaintiff['s] claim under the MWHL

stands or falls on the success of [his] claim under the FLSA." *Turner v. Human Genome Sciences, Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003).

"The employer must satisfy both a 'salary basis' test and a 'primary duties' test to demonstrate that an employee qualifies for an exemption under § 213 [of the FLSA]." *Bonilla v. DOPS, Inc.*, No. GJH-14-3055, 2016 U.S. Dist. LEXIS 25696, at *12 (D. Md. Feb. 29, 2016). The salary basis test is not at issue, because ASR paid Lovo an annual salary of $72,000, which equates to approximately $1,384.62 per week, from September 28, 2015, through January 1, 2017, and ASR subsequently increased his annual salary to $73,440, which equates to approximately $1,412.31 per week. (*See* Lovo Dep. 51:17-52:2, 85:20-86:9; Moore Decl. ¶ 5; Moore Dep. at 38:11-15.) It is thus undisputed that ASR paid Lovo on a salary basis more than $455 per week.[1]

Lovo's status as an exempt employee thus turns on his primary duties as a Process Supervisor for ASR. An employee's "primary duty" is the "the principal, main, major, or most important duty that the employee performs" and is determined by the totality of the circumstances analysis. *Buechler v. Davco Rests., Inc.,* 2009 U.S. Dist. Lexis 106607, at *13 (D. Md. Nov. 16, 2009) (quoting 29 C.F.R. § 541.700(a)); *see also Kreiner v. Dolgencorp, Inc.*, 841 F. Supp. 2d 897, 904 (D. Md. 2012) (Motz, J.). Factors considered include:

> The relative importance of the exempt duties as compared to other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee.

29 C.F.R. § 541.700(a). "[E]mployees who spend more than 50 percent of their time performing

---

[1] When Lovo started his employment with ASR, 29 C.F.R. § 541.600(a) stated: "To qualify as an exempt executive, administrative or professional employee under section 13(a)(1) of the Act, an employee must be compensated on a salary basis at a rate of not less than $455 per week." The U.S. Department of Labor subsequently amended 29 C.F.R. § 541.600, to increase the salary level required to qualify for the executive, administrative, and professional exemptions, but the U.S. District Court for the Eastern District of Texas enjoined the amended regulation on a nationwide basis. *See Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016). Accordingly, the prior version of the regulation remained effective throughout Lovo's employment.

exempt work will generally satisfy the primary duty test," although "time alone . . . is not the sole test." 29 C.F.R. § 541.700(b); *see also In re Family Dollar FLSA Litig.*, 637 F.3d 508, 515 (4th Cir. 2011) (there is no *per se* rule that once the amount of time spent on non-office or manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law).

As explained below, Lovo's primary duties as a Process Supervisor meet the requirements for both the executive and the administrative employee exemptions to the FLSA and the MWHL. Lovo is thus not entitled to overtime pay for any hours he might have worked over 40 in a workweek, and the Court should grant summary judgment in favor of ASR on Lovo's claims under the FLSA and the MWHL.

### 2. Lovo Was An Exempt Executive Employee

#### a. The Elements Of The Executive Employee Exemption

To qualify as exempt under the FLSA's executive employee exemption, the employee's primary duty must satisfy the following three elements:

(1) the employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision;

(2) the employee customarily and regularly directs the work of two or more other employees; and

(3) the employee has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. As described below, each element is satisfied with respect to the Process Supervisor position held by Lovo.

#### b. Lovo's Primary Duty Was Managing A Customarily Recognized Subdivision Of The Process Department.

First, Lovo's primary duty consisted of managing recognized subdivisions within the Process Department, namely, the dock operations, Wash House, and Filter House.

22

A "customarily recognized department or subdivision must have a permanent status and a continuing function." 29 C.F.R. § 541.103(a). "When an enterprise has more than one establishment, the employee in charge of each establishment may be considered in charge of a recognized subdivision of the enterprise." 29 C.F.R. § 541.103(b). The Process Department is divided into five distinct operations, including the dock, the Wash House, and the Filter House. These operations have a permanent status and a continuing function. Specifically, the dock has the continuing function of unloading raw sugar from ships and transporting it to the storage shed, the Wash House has the continuing function of running raw sugar through centrifuges and filters, and Filter House has the continuing function of running raw sugar through an ion exchange process and carbon filters. (*See* DeAngelo Decl. ¶¶ 7-12.) And ASR assigns operators and longshoremen to a specific area of operation within the Process Department. (*See* DeAngelo Decl. ¶¶ 26, 47.) Accordingly, the dock, Wash House, and Filter House are customarily recognized subdivisions within the Process Department at ASR's Baltimore Refinery.

And Lovo's primary duty was management of those areas of operation. "Management" includes, among other things, directing the work of employees, appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status, handling employee complaints and grievances, disciplining employees, planning the work, determining the techniques to be used, apportioning the work among the employees, and providing for the safety and security of the employees or the property. 29 C.F.R. § 541.102. As described above, Lovo's primary duty on the dock included planning and directing the work performed by operators and longshoremen, ensuring that they complied with ASR's safety policies, addressing employee grievances, and, when he determined it to be appropriate, issuing discipline to them. Likewise, Lovo's primary duty in the Wash House and Filter House included directing the work of the

operators to meet daily production goals, ensuring that they complied with ASR' safety policies, and issuing discipline.

It does not matter for purposes of the executive employee exemption that Lovo shared responsibility for managing his assigned areas of operation with other Process Supervisors who managed those areas of operation when Lovo was off duty. Supervision of a subdivision "can be distributed among two, three, or more employees," so long as each such employee "customarily and regularly direct[s] the work of two or more other full-time employees or the equivalent." 29 C.F.R. § 541.104(b).

Lovo may claim that he performed some manual labor alongside the operators at times. As an initial matter, even the operators perform little manual labor as a result of automation and computerization. (DeAngelo Decl. ¶ 48.) And even if Lovo did perform some manual labor, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." 29 C.F.R. § 541.106(a). Lovo at all times remained responsible for managing the areas of operation within the Process Department to which he was assigned. *See In re Family Dollar FLSA Litigation*, 637 F.3d 508, 517 (4th Cir. 2011) ("We conclude that Grace was performing management duties whenever she was in the store, even though she also devoted most of her time to doing the mundane physical activities necessary for its successful operation.").

### c.     Lovo Regularly Directed The Work Of More Than Two Full-Time Employees.

Second, Lovo regularly directed the work of more than enough employees to qualify for the executive exemption. "The phrase 'two or more other employees' means two full-time employees or their equivalent." 29 C.F.R. § 541.104(a).

It is undisputed that, when Lovo worked on the dock, he directed the work of five full-time

operators and one or more gangs of six or more longshoremen. (Lovo Dep. 87:21-88:10, 90:12-91:13, 111:13-20; DeAngelo Decl. ¶ 26.) It is also undisputed that, when Lovo worked in the Wash House and Filter House, he directed the work of five full-time operators who worked in those areas of operation. (Lovo Dep. 95:9-96:14, 149:20-150:12, 325:6-326:4; DeAngelo Decl. ¶ 47.)

> **d.      Lovo Had The Authority To Hire Employees And His Suggestions And Recommendations As To The Firing, Advancement, Promotion, And Other Changes of Status Of Other Employees Were Given Particular Weight.**

The executive employee exemption lastly requires that the employee have the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100. "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* As described below, Lovo and other Process Supervisors have significant authority with respect to the hiring of longshoremen, decisions on whether to retain new employees in the Process Department following their initial training periods, discipline and firing of operators under their supervision, and promotion of operators under their supervision.

Throughout the period that he supervised the dock operations, Lovo had authority to and in practice did, determine independently how many gangs of longshoremen to hire on any given

day and place the orders for those gangs with the ILA locals. (DeAngelo Decl. ¶¶ 40-41.) In other words, Lovo was responsible for hiring longshoremen for the dock operations. (DeAngelo Decl. ¶¶ 40-41.) Likewise, Lovo had the authority to instruct the ILA not to send particular longshoremen back to ASR as part of future gangs, which effectively terminated the employment of those individuals. (DeAngelo Decl. ¶ 30.)

Process Supervisors also had authority to evaluate the performance of new employees for a six week training period and to disqualify employees from new positions during or at the conclusion of their six week training periods. (DeAngelo Decl. ¶ 61.) If an employee is determined by a Process Supervisor to be unqualified at any time during or at the conclusion of the six week training period, the employee will not remain in the position. (DeAngelo Decl. ¶ 61.)

Whether supervising the dock, the Wash House, or the Filter House, Lovo and other Process Supervisors had authority to issue discipline to employees. And Process Supervisors do so regularly. (*See* DeAngelo Decl. ¶ 63.) Because issuing discipline in accordance with a progressive discipline process is a step toward and can ultimately result in the termination of employees, courts have held that this is sufficient to satisfy the fourth element of the executive employee exemption. *See Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 631-32 (E.D. Tex. 2008) (manager who had authority to initiate disciplinary process satisfied fourth element); *Scott v. SSP Am., Inc.*, 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29, 2011) (fourth element satisfied where plaintiff had authority to suspend employees and suspensions usually resulted in termination).

Lovo also had authority to recommend promotions for the employees that he supervised. For example, Process Supervisors have authority to recommend that operators be promoted to vacant Process Supervisor positions, and ASR gives those recommendations significant weight when making promotion decisions. (DeAngelo Decl. ¶ 64.) Conversely, ASR would not generally

26

consider an operator for promotion to a Process Supervisor position if a current Process Supervisor

recommended against the promotion. (DeAngelo Decl. ¶ 64.)

**e.**  **Numerous Courts Around The Country Have Found Supervisors With Similar Duties To Be Exempt Executives.**

Numerous courts around the country have found similar front-line supervisor roles

responsible for managing the work of hourly employees at manufacturing facilities to be exempt

under the executive employee exemption. For example, the court in *Burson v. Viking Forge Corp.*,

661 F. Supp. 2d 794 (N.D. Ohio 2009), concluded that a "shift supervisor" at a forging plant was

an exempt executive. The plaintiff in *Burson* alleged that he had to follow company guidelines in

exercising his managerial responsibilities and could not deviate from the progressive discipline

process in place for the hourly, unionized employees under his supervision. Nevertheless, the court

found that he exercised sufficient discretion to make his primary duty "management" and that,

among other things, his authority to issue warnings under the progressive discipline process meant

that his recommendations were given particular weight. *Id.* at 801-03, 804-06. So too here. *See*

*also Rainey*, 552 F. Supp. 2d at 632 (production supervisor who directed the work of an hourly

unionized workforce was exempt under the executive exemption); *Wilbur v. Silgan Containers*

*Corp.*, No. 2:06-cv-02181-MCE-EFB, 2008 U.S. Dist. LEXIS 72804, at *27 (E.D. Cal. Aug. 18,

2008) (same); *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1019 (E.D. Mich. 2005)

(same); *Cooper v. Drexel Chem. Co.*, 949 F. Supp. 1275, 1281 (N.D. Miss. 1996) (production

supervisor who oversaw milling operations on the day shift was exempt under the executive

exemption, even though "he sometimes worked alongside other employees").

**3.**  **Lovo Also Qualified As An Exempt Administrative Employee.**

**a.**  **The Elements Of The Administrative Employee Exemption**

An employee qualifies for the administrative employee exemption if:

27

(1) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(2) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200. The primary duties of Process Supervisors satisfy both elements.

> **b.    Lovo's Primary Duty Was The Performance Of Non-Manual Work Directly Related To the Management And General Business Operations of ASR.**

"To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a). "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . quality control; . . . safety and health; personnel management; . . . labor relations; . . . and similar activities." 29 C.F.R. §541.201(b). Lovo's primary duty related to all of these areas.

Lovo's primary duty included personnel management. Neither the FLSA nor the applicable regulations define the term "personnel management." At least one court has relied on Black's Law Dictionary to hold that the plain meaning of this phrase is "making decisions for a department regarding the people who work in a company." *Muscat v. Minacs Grp. United States,* No. 322971, 2015 Mich. App. LEXIS 2244, at *7 (Mich. Ct. App. Dec. 3, 2015). This is precisely what Lovo did as a Process Supervisor. It is undisputed that Lovo's primary duty was not to operate cranes, shovel sugar out of ship holds, or to operate the machines used in the refining process. Rather, Lovo's primary duty was to manage the individuals who performed those tasks. To do so, he

28

directed the day-to-day work of the employees under his supervision, ensured they followed all company policies and procedures, ensured that they received all necessary training, issued discipline to them when he determined it was appropriate, and ensured they accurately recorded their hours worked. (*See supra* Section II(E)(7).) *See Lane v. Sys. Application & Techs.*, Case No. DKC 13-3566, 2015 U.S. Dist. LEXIS 27422, at *27 (D. Md. Mar. 6, 2015) (employee who "was supervisor of record for at least three employees, in which capacity she approved requests for leave, advised them about company policy, and assigned them work" performed work directly related to the management or general business operations of her employer).

Lovo's primary duty also included quality control. For example, when working in the Wash House and Filter House, Lovo determined when to adjust the refining process to ensure that the output met the desired characteristics and determined the blend of the sugar coming out of the storage shed. (*See supra* Section II(E)(3)(c).) When he supervised the dock operations, Lovo had to prepare various reports that allowed ASR to ensure that its operations are running efficiently and to identify potential areas for improvement. (Lovo Dep. 267:6-270:12; DeAngelo Decl. ¶ 44.) And in all three areas of operation that he supervised during his employment with ASR, Lovo ensured that employees under his supervision received quality control trainings, and he determined when to defer maintenance and when to slow down or stop operations to allow it to proceed immediately. (Lovo Dep. 177:1-178:6; DeAngelo Decl. ¶¶ 34, 52.)

Lovo's primary duty also included safety responsibilities, such as training on and enforcing ASR's safety policies, performing periodic safety contacts, conducting three and five step processes when incidents occurred, and shutting down and evacuating part or all of the Baltimore Refinery if he were to identify a significant safety hazard. (*See supra* Section II(E)(5-6).)

Lovo's primary duty also included labor relations responsibilities. As described above,

29

when he supervised the dock operation, Lovo was tasked with working directly with the ILA locals to order the number of gangs of longshoremen that he determined were necessary. (*See supra* Section II(E)(2)(c).) He also worked directly with the ILA to address any issues that arose with the longshoremen provided by the ILA. (*See supra* Section II(E)(8).) And he was tasked with representing ASR at union grievance hearings arising out of the areas of operation that he supervised. (Moore Decl. ¶¶ 8-9.) As an example, when two longshoremen got into a fight on the dock, Lovo's investigation led to disciplinary action for the involved employees, and Lovo represented ASR at the grievance hearing when one of the employees subsequently filed a grievance. (Moore Decl. ¶¶ 8-9; Moore Dep. 47:13-48:8.)

*Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005), is instructive. In *Kennedy*, the Seventh Circuit examined whether various positions at nuclear power plants qualified for the administrative exemption, beginning with whether their primary duties related to management or general business operations of the employer. *Id.* at 372-74. A few of those positions are analogous to Process Supervisors. For example, the power plants employed "work planners" who developed plans for maintaining and repairing machines, but did not themselves perform the manual labor of implementing their plans. *Id.* at 373. The court found this to be a "strategic" role responsible for "advising the management about the best way to operate the plant when difficulties arose." *Id.* Like these work planners, Process Supervisors are responsible for developing plans for when and how maintenance and other work in their areas of operation is to be completed, but are not responsible for themselves performing the manual labor necessary to implement those plans. *Kennedy* also examined "lead planners" and "first line supervisors," whose "primary task is managing the work of others." *Id.* The primary duty of these employees included "guid[ing] other employees to make sure that work packages are implemented efficiently and tasks are completed

on time." *Id.* As such, the court found their work to be administrative. *Id.* So too with Process Supervisors.

Accordingly, like the work planners and supervisors at issue in *Kennedy*, the work of Process Supervisors directly relates to the management and general business operations of ASR.

### c.    Lovo's Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance.

"To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §541.202(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* However, discretion and independent judgment does not mean unfettered discretion:

> [E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

29 C.F.R. §541.202(c). Lovo's primary duty involved the exercise of discretion and independent judgment in a number of areas related to the management and general business operations of ASR.

Lovo exercised discretion and independent judgment in significant matters involving personnel management. For example, he was responsible for setting work schedules for the employees working under his supervision, directing their day-to-day work, and determining when they should work overtime. (*Supra* Section II(E)(2)(b), (3)(d), (7).) He also was responsible for

issuing discipline when he determined that it was appropriate. (*Supra* Section II(E)(7).) Further, ASR expected him to make recommendations regarding the staffing level of the areas of operation under his supervision and to determine whether any new employees in those areas of operation were qualified to remain in their positions after a six week introductory period. (*Id.*) *See Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000) (supervision of four employees and coordinating the work of other employees in the office required the exercise of discretion and independent judgment); *Pruitt v. Sherrod Servs., L.L.C.*, Case No. W-12-CV-103, 2012 U.S. Dist. LEXIS 193346, at *18 (W.D. Tex. Nov. 9, 2012) (granting summary judgment in favor of the employer when the plaintiff's "primary duties related to the management of the crews and their supervisors").

Lovo exercised discretion and independent judgment in significant matters involving quality control. For example, in the Wash House and Filter House, Lovo had discretion to determine the blend of sugar that would go into the refining process and to direct operators to make numerous changes to the refining process to ensure a consistent, quality product. (*Supra* Section II(E)(3)(c).) In the dock operation, Lovo had discretion to determine how to most efficiently discharge raw sugar off of a ship. (*Supra* Section II(E)(2)(d).) Lovo also always had discretion to slow down or stop operations to allow for maintenance work, even though this could have the effect of slowing down other operations further down the line in the refining process. (*Supra* Section II(E)(2)(b), (3)(c)).) And he had discretion with respect to the scheduling and manner in which he conducted quality control trainings. (*Supra* Section II(E)(2)(d), (3)(c)).)

Lovo exercised discretion and independent judgment in significant matters involving safety. For example, Lovo determined when and where to conduct safety contacts and safety trainings and had discretion to slow or shut down operations in part or all of the Baltimore Refinery

when he determined it was warranted by safety concerns. (*See supra* Section II(E)(6).) When incidents occurred, Lovo completed three step and five step processes, which included his recommendations for avoiding similar incidents in the future. (*See supra* Section II(E)(5).) *See Simpson v. Prince Telecom, LLC*, Case No. 14-1211-SLR-SRF, 2017 U.S. Dist. LEXIS 48481, at * 29 (D. Del. Mar. 31, 2017) (employee with "authority to implement policies with respect to vehicle and technician safety and accountability" satisfied the administrative exemption)

Lovo exercised discretion and in significant matters involving labor relations. For example, he determined the number of gangs of longshoremen to order from the ILA each day and he determined when and how to communicate with the ILA to address any issues with individual longshoremen. (*See supra* Section II(E)(2)(c), Section II(E)(8).)

*Kennedy* is again instructive. The plaintiffs in *Kennedy* argued that "because a nuclear power plant is an exceedingly regulated workplace . . . there was no room for any of the plaintiffs to exercise independent judgment." *Kennedy*, 410 F.3d at 374. The Seventh Circuit rejected that argument, because the "work planners" and "lead planners" who develop instructions for resolving problems around the plant are "problem solvers who, when "[f]aced with novel or not-so-novel problems . . . must use their independent judgment to determine how best to respond." *Id.* at 375. This is analogous to Process Supervisors, who, as described above, must determine how to respond to countless "novel or not-so-novel" situations every day and use their independent judgment to do so. The Seventh Circuit also held that the "lead work planners" and "first line supervisors" at issue in that case used discretion and independent judgment, because they "are in routine contact with upper management, making recommendations about projects, schedules and personnel." *Id.* The same could be written about Process Supervisors.

Accordingly, the primary duty of Lovo's Process Supervisor positions in the dock

33

operations, the Wash House, and Filter House qualify for the administrative employee exemption.

**B.      ASR Is Entitled To Summary Judgment On Lovo's MWPCL Claim.**

**1.      ASR Did Not Unlawfully Withhold Wages, Because It Properly Classified Lovo As Exempt.**

As described above, ASR properly classified Lovo as an exempt employee under the FLSA and the MWHL. The MWPCL applies only to unlawfully withheld wages. *See Lockley v. Town of Berwyn Heights*, 2015 U.S. Dist. LEXIS 121215, Case No. JFM-14-825, at *36 (D. Md. Sept. 11, 2015). Accordingly, because ASR was not required to pay overtime to Lovo, ASR is entitled to summary judgment on Lovo's MWPCL claim. *See id.* (granting summary judgment on an MWPCL claim where the plaintiff "was not entitled to overtime pay because he was an 'exempt' employee" and, "[a]s a result, such wages were not unlawfully withheld").

**2.      Treble Damages Under The MWPCL Are Unavailable To Lovo.**

ASR also cannot be liable for the enhanced damages available under the MWPCL unless it withheld the wages "not as a result of a bona fide dispute." Md. Code, Lab. & Empl. § 3-507.2(b). A "bona fide dispute exists when an employer has a good faith basis for withholding wages or when there is a legitimate dispute over the validity of the claim for unpaid wages or the amount that is owing." *Barufaldi v. Ocean City*, 7 A.3d 653, 660 (Md. Ct. Spec. App. 2010). As described above, the duties of the Process Supervisor position qualify for both the executive and administrative employee exemption. At a minimum, the duties and responsibilities described above establish a bona fide dispute over Lovo's entitlement to overtime.

Finally, there is no evidence in the record of Lovo having suffered any consequential damages, such as late charges or evictions, as a result of the alleged failure by ASR to pay overtime to him. Rather, it is undisputed that Lovo timely received all of the pay that was promised to him by ASR. "[N]umerous decisions in this District support the view that, in the absence of

consequential damages, the plaintiff is entitled only to double damages under the FLSA, but not to treble damages under the MWPCL." *McFadden v. L&J Waste Recycling, LLC*, Civil Action No. ELH-16-2744, 2017 U.S. Dist. LEXIS 109532, at *15 (D. Md. July 14, 2017) (collecting cases); *see also Sanabria v. Cocody, Inc.*, 2017 U.S. Dist. LEXIS 110920, Case No. DKC 16-0365, at *10 (D. Md. July 17, 2017) (declining to award treble damages under the MWPCL in connection with a default judgment because "Plaintiffs have provided no evidence of any consequential damages suffered as a result of Defendants' violations"); *Paige v. CD#15CL2001, Inc.*, 2017 U.S. Dist. LEXIS 6787, Case No. PWG 15-3691, at *13-14 (D. Md. Jan. 18, 2017) (same).

## V.   **CONCLUSION**

WHEREFORE, for the foregoing reasons, ASR respectfully requests that summary judgment be entered in its favor on all claims, and that ASR be awarded the costs and attorneys' fees it incurred in defending this action.

Dated: February 26, 2018                     Respectfully submitted,

                                         /s/
                                  Emmett F. McGee, Jr. (Federal Bar No. 08462)
                                  Keith Hudolin (Federal Bar No. 13688)
                                  JACKSON LEWIS P.C.
                                  2800 Quarry Lake Drive, Suite 200
                                  Baltimore, MD 21209
                                  Telephone:     (410) 415-2000
                                  Facsimile:     (410) 415-2001
                                  emmett.mcgee@jacksonlewis.com
                                  keith.hudolin@jacksonlewis.com

                                  *Attorneys for Defendants*