**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| HELDER VLADIMIR LOVO, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Action No. 1:17-CV-00418-JFM |
| AMERICAN SUGAR REFINING, INC., *et al.* | * | |
| | * | |
| *Defendants*. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**
**AMERICAN SUGAR REFINING, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Helder Vladimir Lovo, by and through counsel and pursuant to the Stipulated Briefing Deadlines (ECF 35), now timely files this Response in Opposition to Defendant American Sugar Refining, Inc.'s Motion for Summary Judgment. For the reasons stated herein, American Sugar Refining, Inc.'s Motion must be denied.

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  STATEMENT OF RELEVANT FACTS ............................................................... 2

   A.   *Undisputed facts as to Mr. Lovo's employment with ASR.* ............................... 2

   B.   *Disputed facts as to Mr. Lovo's employment with ASR.* .................................. 2

III. LEGAL STANDARD ........................................................................................... 9

IV.  ARGUMENTS AND AUTHORITIES ................................................................ 10

   A.   *FLSA exemptions.* ........................................................................................... 10

   B.   *Mr. Lovo was not exempt employee pursuant to the "Executive" exemption.* ............... 11

      1.   *Mr. Lovo did not customarily and regularly direct the work of two or more other employees.* ........................................................................................... 11

      2.   *Mr. Lovo did not have any authority with regard to hiring or firing.* ........................ 13

      3.   *Mr. Lovo's primary job duties did not involve management of an enterprise, recognized department or subdivision thereof.* ..................................................... 17

   C.   *Mr. Lovo was not exempt pursuant to the Administrative exemption.* ......................... 19

      1.   *Mr. Lovo's primary job duty did not consist of office or non-manual work directly related to the management or general business operations of ASR.* ................... 19

      2.   *Mr. Lovo's primary job duties did not involve the exercise of discretion and independent judgment with respect to matters of significance.* ............................ 26

   D.   *Mr. Lovo's duties did not satisfy the Primary duty requirements of the Executive or the Administrative Exemption.* ..................................................... 31

   E.   *Genuine issues of material fact exist on Mr. Lovo's MWPCL and MWHL claims.* ........ 34

V.   CONCLUSION .................................................................................................. 35

## I.    INTRODUCTION

Plaintiff Helder Vladimir Lovo is a former employee of American Sugar Refining, Inc. ("ASR") who held the job title of "Process Supervisor."  In arguing for summary judgment, ASR's Motion now relies heavily upon Mr. Lovo's job title (Process Supervisor) and the job duties performed by *other* Process Supervisors employed by ASR.  All of ASR's arguments in this regard are to no avail, as an employee's exempt status is determined by the primary duties performed by that individual, not a job title or duties performed by other employees with the same job title. Despite ASR's protestations, genuine issues of material fact exist as to whether Mr. Lovo's job duties qualified him as an exempt employee under the Fair Labor Standards Act ("FLSA") or Maryland Wage and Hour Law ("MWHL").

Moreover, ASR's Motion demonstrates that it has engaged in serious discovery violations throughout this case, including violating the Court's Discovery Order on confidentiality, attaching supporting documents to its Motion which Mr. Lovo requested during discovery but which ASR refused to produce, and relying upon legally meaningless affidavits which are not made upon personal knowledge and which assert inadmissible hearsay.  Due to the tremendous breadth and significance of these violations, Mr. Lovo has filed a separate Motion against ASR in this regard, which it incorporates herein by reference.  *See* ECF 38 (Lovo Motion for Sanctions).

For all of these reasons, as described in greater detail below, numerous genuine issues of material fact undeniably exist as to whether Mr. Lovo was an exempt employee during his employment with ASR.  Accordingly, Mr. Lovo respectfully requests that the Court deny ASR's Motion for Summary Judgment.

## II.     STATEMENT OF RELEVANT FACTS

**A.     *Undisputed facts as to Mr. Lovo's employment with ASR.***

Mr. Lovo was employed by ASR from September 28, 2015 through November 24, 2017, throughout which time he worked at ASR's Baltimore refinery and held the job title of "Process Supervisor."  *See* ECF 36-1, pp. 3–4.  ASR initially assigned Mr. Lovo to work on the dock operations (September 2015 through December 2016), and later reassigned him to work in the Wash House and Ion Exchange (January 2017 through November 2017).  *See id.*

**B.     *Disputed facts as to Mr. Lovo's employment with ASR.***

Throughout the "Facts" section of ASR's Motion, it alleges that Mr. Lovo's primary job duties involved the exercise of significant management authority, autonomy, and independent judgment.  ECF 36-1, pp. 3–19.  Mr. Lovo denies those contentions.  For the reasons stated herein, genuine issues of material fact undeniably exist with regard to all substantive issues as they relate to Mr. Lovo's primary job duties and the application of FLSA and MWHL exemptions.

Mr. Lovo's primary job duties involved communicating upper management's orders to individuals working as "operators."  Ex. 1 (Lovo Depo.), 98:4-21 (stating he "can't make any decisions"), 117:8-21 (he is merely "the point of communication"), 321:21-323:14 (he "cannot tell [anyone] what to do"); Ex. 7 (Ford Depo.), 70:21-71:9 (fellow Process Supervisor stating, "I got orders from higher-ups . . . [t]hen I would, you know, convey that to employees").

In turn, the operators were expected to perform the labor associated with accomplishing ASR's production goals.  *Id.*  The goals for production were established exclusively by ASR, absent any input from Mr. Lovo.  Ex. 1 (Lovo Depo.), 175:7-9 ("[M]y main focus is trying to meet production standards that have been established by my boss"), 133:7-134:2, 158:15-19, 261:3-8, 262:2-3.

Mr. Lovo did not have authority to deviate from management's orders or ASR's standard procedures.  Ex. 1 (Lovo Depo.), 156:9-14 ("I cannot make any decisions or change anything without the approval of my boss, so, no, I did not make any changes"), 98:4-12, 150:19-151:18, 255:2-257:11.   Mr. Lovo had minimal, if any, ability to exercise discretion or independent judgment regarding performance of his job duties.  *Id.* at 120:15-121:19 ("Mr. Wooters would say, hey, I want this sugar to go on the west side or on the east side, so whatever he wants, that's what we do"), 137:15-138:16 (there are fixed procedures for every process and "everything is written in stone"), 156:9-157:11, 162:21-163:9 ("I have not made any changes [to make the business operate better or more smoothly] . . . I just follow orders"), 256:10-257:5; Ex. 7 (Ford Depo.), 70:21-71:9 ("I don't determine [what is most important] . . . I [just] get orders from [my supervisor]").  By way of example, Mr. Lovo could not create new orders, change policies, or alter any procedures.  Ex. 1 (Lovo Depo.), 137:15-138:16 ("All I do is make sure that [employees] are following their work procedure or just following whatever is written in [the procedures]").

ASR repeatedly argues in its Motion that Mr. Lovo was responsible for conducting employee "training."  ECF 36-1, pp. 1–2, 10, 13, 16, 18, 25–26, 28–29, 32.  However, Mr. Lovo simply distributed the training materials, absent any actual authority or autonomy relating to conducting training.  Ex. 1 (Lovo Depo.), 176:6-177:7 (with regard to training materials, "I print them out [and distribute them] . . . they're already on the system").  Indeed, Mr. Lovo's supervisor, Mr. Ryan Wooters,[1] testified that Mr. Lovo had no role in training or creating training materials:

Q:     Who creates the information that is related during the trainings?
A:     I'm not sure. It's a database of monthly trainings. I don't know who created them.
Q:     It's not created by Mr. Lovo, is it?
A:     No. They were created before Mr. Lovo's tenure.

---

[1] Mr. Wooters is also a named defendant in this matter.  Throughout his deposition, Mr. Wooters testified in both his individual capacity and as the Rule 30(b)(6) designee testifying on behalf of ASR.  Ex. 3 (Wooters), 6:9-10:7.

> Q:      Mr. Lovo doesn't have any role in creating the content of the training, does
>         he?
> A:      Not the monthly training that we put out, no.
> Q:      He doesn't have any role in creating the content of any training, does he?
> A:      He does not.
> Q:      With regard to these quizzes that are taken along with the training, [Mr.
>         Lovo] doesn't have any role in creating the quizzes, does he?
> A:      They're already in the database. They've already been created. So, no.

Ex. 3 (Wooters Depo.), 160:18-161:15.

ASR also acknowledges that Mr. Lovo's job duties required him to perform manual labor, but attempts to argue that Mr. Lovo's obligations in this regard were insignificant.  *See e.g.*, ECF 36-1, p. 24.  In contrast, throughout his deposition and while under careful cross-examination by opposing counsel, Mr. Lovo testified consistently and extensively to the fact that the performance of manual labor was a primary duty of his employment.  Ex. 1 (Lovo Depo.), 99:1-101:13 ("I have to go up there, clean their feeder gate"), 100:16-21 (he has to "clean the scale"), 128:1-129:3 ("I have to clean the hopper out"), 132:1-13 ("so sometimes we have to . . . hose it out because the sugar is so thick . . . you know, hose, hose the product out, since it's such a thick material"), 142:20-143:5 ("[O]ne of the things that I have to do is, you know, I have to empty storage filters"), 215:14-216:14 ("[A]nything physically that needs to be done . . . I have to do it myself . . . [I] have to move hoses, you have to move the pump from here to there, if you're emptying out a filter"), 264:7-10 (Q: What happens if one of the operators that . . . you're responsible for supervising doesn't show up for work? A: Then I would have to fill in [for them]), 326:5-327:5 ("[I]t's a big hassle because . . . that sugar turns hard . . . I have to put hot water in there in order to break that through).

Indeed, over the course of Mr. Lovo's full-day deposition,[2] defense counsel, Mr. Emmett F. McGee, Esq., was continually engaging in the improper practice of asking Mr. Lovo the same

---

[2] Mr. Lovo's deposition began at 9:05 a.m. and concluded at 6:03 p.m.  *See* Ex. 1 (Lovo Depo.).

or substantially identical questions regarding his job duties, hoping to elicit different answers. *See*

Local Rules, Appx. A, Guideline 6. When the undersigned objected to Mr. McGee's questioning,

Mr. McGee presented the following obnoxious question to Mr. Lovo simply in order to continue

his repetitive questioning without asking, verbatim, the "same or substantially identical" question:

> MR. MILLMAN: You are asking the same question again, which is presumptively
> improper under the local rules, discovery guidelines. And I think we need to change
> the question topic because you've already asked this, and he's already answered
> this.
> MR. MCGEE: I'll make it real easy for him. Other than what you've just told me,
> ***have you done anything to earn a $72,000 salary***?
> A:     Yes.
> Q:     What?
> A:     Worked my butt off.
> Q:     Doing what?
> A:     Actually a lot of manual work, moving hoses, pumps, shoveling. I've never
> been a supervisor. I've never done so much labor work like I do [working for ASR].

Ex. 1 (Lovo Depo.), 160:13-161:9 (emphasis added).

Mr. Michael Ford is a former employee of ASR who worked as a Process Supervisor and

who was responsible for initially training Mr. Lovo. Ex 11 (Ford Decl.), ¶¶ 3–10. Mr. Ford has

provided an extensive affidavit detailing the manual labor performed by Process Supervisors and

other facts which clearly demonstrate that Mr. Lovo did not qualify as an exempt employee. *Id.*

at ¶¶ 17–42. Following the submission of Mr. Ford's affidavit, Mr. McGee subpoenaed Mr. Ford

to appear for a deposition which, like Mr. Lovo's deposition, spanned the entire day.[3] Throughout

the deposition, Mr. Ford continually testified to the manual labor he and other Process Supervisors,

including Mr. Lovo, had to perform. Ex. 7 (Ford Depo.), 180:10-181:8 (stating a Process

Supervisor "actually would have to fill in" and perform the labor of an absent operator), 230:11-

---

[3] Mr. Ford's deposition began at 9:35 a.m. concluded at 6:18 p.m. *Id.* at pp. 1, 317. During the deposition, Mr. McGee engaged in further improper conduct, such as asking Mr. Ford harassing and irrelevant questions relating to his sexual history dating back 15-years. Ex. 7 (Ford Depo.), 11:12–12:8.

15 ("You had so many issues with tanks overflowing and you've got to unclog the drains. It was -

- it was work. ***It was definitely manual labor***"), 235:17-236:7 ("You had to get your hands dirty").

Indeed, there was so much testimony regarding manual labor that it led Mr. McGee to

presenting the following improper and repetitive line of questioning:

> Q:      You said something about manual labor. ***What's manual labor***?
> A:      It's -- I don't know. ***It's in a shovel unclogging drains. Shoveling sugar.
> Just climbing up on top of tanks.*** Whatever. You just -- whatever it took to keep
> the process going. I mean, ***you're not sitting at a desk*** in front of a computer for
> sure. So ***you're actually out on the floor*** because that's where you're needed.
> Q:      ***How often did you have a shovel in your hand***?
> MR. MILLMAN: Objection.
> A:      How often did I have a shovel in my hand?
> Q:      Yeah.
> A:      I don't know. All depends on -- I guess it all depends on the situation but if
> something overflowed, you want to help the operator out because you don't have
> that many people at your disposal. How often did I have a shovel? I don't know,
> ***whenever it was needed. Once a week, twice a week.*** I don't know. ***Maybe a little
> more than that.***
> Q:      And so -- and when you had a shovel in your hand, ***how long would it be in
> your hand***? In other words --
> MR. MILLMAN: Objection.
> A:      I don't know . . . [234:3] I can't answer that . . . [234:11] I would be
> speculating so I'm not going to answer that.

*Id.* at 232:17-234:19 (emphasis added).

During the last two-months of Mr. Lovo's employment with ASR, he was issued a

performance evaluation by Mr. Wooters which covered the 12-month period spanning from

October 1, 2016 through September 30, 2017.  Ex. 8 (Unsatisfactory Perf. Eval.), Bates nos. 268-

271.  Mr. Wooters rated Mr. Lovo's performance as "unsatisfactory," and specifically stated that

this substandard performance rating was based on the following:

> Manager Comments: "***[Mr. Lovo] shows little ability to delegate . . . often times
> performs work himself rather than delegate*** . . . continually relies on his peers and
> subordinates to make decisions in regard to the process."
> 2.1 Technical Expertise: "[Mr. Lovo] cannot continue to grow with in [sic] the
> refinery if ***he must continually rely on this peers for and subordinates to make***

*decisions.* [Mr. Lovo] needs to learn and make those decisions in order to contribute."

2.4 Taking Initiative/Accountability: "*[Mr. Lovo] does not take initiative* while on shift. *He must be continually overseen during his shift.* [Mr. Lovo] must take initiative and make decisions[.]"

3.1 Delegating Empowering Others: "[Mr. Lovo] shows little to no delegation ability . . . *[Mr. Lovo] often performs operator work instead of delegating or holding operators accountable of [sic] carrying out their duties* . . . must increase his ability to delegate authority.

3.3 Developing People: "[Mr. Lovo] does not develop people within the refinery. [Mr. Lovo] *often times performs the work of his subordinates rather than coaching to improve their performance.*"

3.5 Achieving Results Through Others: "[Mr. Lovo] often times *performs work himself to achieve results rather than delegate to achieve results through others.*"

*Id.* (emphasis added).

The focus of Mr. Lovo's job was to meet the production goals established by management, which was the output of "6.8-million pounds melt" per day when working in the Wash House, or if working on the dock, the "discharge" of eight-million pounds of sugar. Ex. 1 (Lovo Depo.), 261:3-8; 350:17-21. As a result, Mr. Lovo often had to perform manual labor alongside the operators to ensure the orders were satisfied and the production goals were accomplished. *Id.* at 128:21-129:3, 134:7-136:14, 145:1-2; Ex. 7 (Ford Depo.), 260:14-17. He would clean equipment, shovel sugar, and fill-in or assist with any of the various jobs involving manual labor, all of which Mr. Lovo did on a regular basis and as a primary duty of his employment. Ex. 1 (Lovo Depo.), 99:1-10, 99:13-21, 100:16-21, 128:6-12, 132:1-13, 143:1, 215:14-216:14, 264:7-10, 326:16-327:5; Ex. 7 (Ford Depo.), 180:17-181:8.

During nearly every shift Mr. Lovo worked for ASR, there was a supervisor either directly or indirectly overseeing Mr. Lovo's work and his performance. Ex. 9 (Lovo Decl.), ¶ 4. Mr. Lovo was required to report to his supervisor with regard to all aspects of the operations which he oversaw, and he did not have the authority to make any meaningful decisions effecting operations. Ex. 1 (Lovo Depo.), 89:10-17 ("The chief mate instructs me on what to do, because we can't

7

[make] decisions while we're on the ship); 98:4-12 ("We get what's called a discharge statement. That's what we need to follow"); 125:14-17 ("[S]omething Mr. Wooters always requests from us is [to have] the proper channel of communication. Everything I do I need to report it"); 150:19-151:9 ("I also follow instructions from [the Unit One Supervisor]"); 294:5-10 ("I just follow and do whatever orders he tells me").

When operational problems arose, Mr. Lovo's first obligation was to report the matter to his supervisor. He would then be required to await instructions as to how to resolve the matter, all of which typically occurred without any autonomous decision making on Mr. Lovo's part. Ex. 1 (Lovo Depo.), 290:7-291:6, 300:5-20, 311:17-313:1; Ex. 7 (Ford Depo.), 219:14-220:1.

ASR's Motion continually argues that Mr. Lovo had discretion, authority, and autonomy with regard to matters of employee discipline. *See* ECF 36-1, pp. 1–2, 17, 23–27, 29, 31–32. In contrast, Mr. Lovo contends that he was afforded the *absolute minimal authority* with regard to discipling employees. Specifically, as confirmed by the testimony of Mr. Wooters, the only form of "discipline" which Mr. Lovo was authorized to issue was a "verbal coaching." Ex. 3 (Wooters Depo.), 87:11-88:15 (cannot recall Mr. Lovo ever issuing a written discipline), 93:6-9 (same); Ex. 1 (Lovo Depo.), 139:13-19.

ASR argues that Mr. Lovo's primary job duties involved the management of subordinates and ASR's overall operation. ECF 36-1, pp. 1–2, 5–14, 17–19. Mr. Wooters, however, has testified that Mr. Lovo lacked control or input into any terms and conditions affecting the employment of others, including even the individuals for whom Mr. Lovo was specifically taaked with monitoring. Ex. 3 (Wooters Depo.), 155:2-5, 155:13-156:2, 156:3-5. Mr. Lovo did not conduct any performance evaluations. *Id.* at 155:2-5. Moreover, he did not have a role in setting the wages of any other individuals working for ASR. *Id.* at 156:3-5.

8

It is undisputed that Mr. Lovo had absolutely no authority to hire or fire any employees on behalf of ASR.  Ex. 3 (Wooters Depo.), 81:1-82:16, 85:4-9, 86:3-7; Ex. 4 (Moore Depo.), 41:7-9; *see also* Ex. 7 (Ford Depo.), 308:6-309:12.   Indeed, Mr. Lovo was completely removed entirely from both the hiring and firing process, as he: (1) never received or reviewed any applications for hire; (2) never interviewed candidates for employment; and (3) was not expected to give any recommendation regarding the hiring or firing of an ASR employee.  *Id.*

With regard to the larger picture of ASR's operations, Mr. Lovo did not have any role in its business operations.  Ex. 1 (Lovo Depo.), 162:21-163:9.  He did not have any management-level responsibilities with regard to how to the business operates, making the business operate better, or run more efficiently.   *Id.*   In addition, other than rudimentary input as to the basic operations he oversaw, Mr. Lovo did not provide any higher level input into how ASR's business should operate or could improve.  *Id.* at 157:18-158:12; 200:2-201:4; 345:5-346:4.

## III.   LEGAL STANDARD

Summary judgment shall only be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  The court should view the evidence in the light most favorable to the non-moving party, Mr. Lovo in this instance, and draw all inferences in his favor.  *Id.* at 255.

9

## IV.     ARGUMENTS AND AUTHORITIES

### A.     *FLSA exemptions.*

The FLSA requires employers to pay their employees at the overtime premium rate of one-and-one-half (1.5) times their regular rate of pay for hours worked in excess of 40 in a workweek. 29 U.S.C. §207.   The FLSA also sets out several defined exemptions.   29 U.S.C.A. § 213. However, these exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within [the exemptions] terms and spirit."   *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 120 (4th Cir. 2015) (*quoting Desmond v. PNGI Charles Town Gaming, L.L.C.,* 564 F.3d 688, 692 (4th Cir.2009)).   The burden is upon the employer, ASR in this case, to demonstrate that the requirements of the exemption are satisfied.   *Id.*

ASR asserts in its Motion that Mr. Lovo is exempt from the FLSA pursuant to the both Executive and Administrative exemptions.   ECF 36, pp. 20–34.   Mr. Lovo disagrees and genuine issues of material fact now exist as to all relevant legal-elements which determine whether the Executive or Administrative exemptions applied to Mr. Lovo during his employment with ASR.[4]

Analyzing the application of an FLSA exemption requires understanding an employee's "primary job duties."   29 C.F.R. 541.100, 541.200.   Courts consider five primary factors in determining whether a job duty is considered "primary":

> (1) the character of the person's job; (2) the importance of the exempt duties performed versus the non-exempt duties performed; (3) the amount of time spent performing exempt work; (4) the employee's relative freedom from direct supervision; and (5) the relationship between the employee's salary and wages paid to other employees for the kind of non-exempt work performed by the employee.

---

[4] As correctly noted by ASR in its Motion, the salary basis test is not at issue in this case.   ECF 36, p. 21.   Rather, all issues effecting the legal analysis of whether an exemption applies are based upon Mr. Lovo's job duties and the work he actually performed during his employment.

29 C.F.R. 541.700. Job duties which are not "primary" cannot be asserted to support an exemption.

29 C.F.R. 541.100, 541.200.

**B.** **_Mr. Lovo was not exempt employee pursuant to the "Executive" exemption._**

In order for an employer to properly classify an employee as exempt under the Executive

exemption, the employee's primary job duties must consist of:

> [1] management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; [2] who customarily and regularly directs the work of two or more other employees; **_and_** [3] who has the authority to hire or fire other employees or whose suggestions and recommendations as to the firing, firing, advancement, promotion, or any other change of status of other employees are given particular weight.

29 C.F.R. 541.100 (emphasis added to "and," signifying it is _conjunctive_ test). All three-prongs

must be satisfied in order for an employer to claim the exemption. Accordingly, if a genuine issue

of material fact is demonstrated by Mr. Lovo with regard to just one-prong of the test, ASR's

Motion must be denied. Irrespective, as shown below, Mr. Lovo can demonstrate that genuine

issues of material fact exist with regard to _all_ of the elements.

    1.    _Mr. Lovo did not customarily and regularly direct the work of two or more other employees._[5]

As noted, the Executive exemption requires that the employee "customarily and regularly

directs the work of two or more other employees." _Id._ While Mr. Lovo was the named supervisor

of a group of two or more operators, he did not "customarily and regularly" direct their work.

For work orders relating to jobs performed by operators who Mr. Lovo oversaw, Mr. Lovo

did not have any role in creating or determining the relevant assignments or instructions. Ex. 1

(Lovo Depo.), 98:4-12; Ex. 7 (Ford Depo.), 70:21-71:9. ASR's pre-determined procedures,

together with upper-level management, determined the assignments which Mr. Lovo was, in turn,

---

[5] In this analysis, Mr. Lovo does not present the three elements in the same order they are described in the Regulation.

charged with communicating to the operators who he oversaw.  Ex. 1 (Lovo Depo.), 120:15-121:5, 137:15-138:16.  Mr. Lovo was merely responsible for conveying the orders.  Ex. 7 (Ford Depo.), 70:21-71:9.

After conveying the orders, Mr. Lovo was responsible for monitoring the work of the operators for compliance with ASR's policies, procedures and the given assignments.  Ex. 1 (Lovo Depo.), 136:19-137:8; 137:15-138:16.  Mr. Lovo simply served as a conduit of communication between the operators, management and potentially other departments.  Ex. 1 (Lovo Depo.), 130:4-8; 321:15-323:9; Ex. 7 (Ford Depo.), 123:15-124:17.

When Mr. Lovo conveyed a directive to an operator, it typically originated as an instruction from management, or a part of the operator's regular responsibilities as described in the ASR's manual and procedures.  Ex. 1 (Lovo Depo.), 321:21-323:13, 98:4-12, 162 9-18, 138:10-16; Ex. 7 (Ford Depo.), 70:21-71:9.  To the extent Mr. Lovo engaged in discussions with an operator regarding work performance issues, this was in the form questions, not directions.  Ex. 1 (Lovo Depo.), 119:19-120:7.  In response, operators would often refuse Mr. Lovo's inquiries or statements, stating they are busy or otherwise could not perform any requested work.  Ex. 1 (Lovo Depo.), 119:19-120:7; Ex. 7 (Ford Depo.), 247:9-13.

Each operator hired by ASR was assigned a specific position, issued certain responsibilities, and given specific procedures to follow; indeed, Mr. Lovo described it best by stating: "everything is written in stone." Ex. 1 (Lovo Depo.), 137:19-138:16.  Mr. Lovo did not assign operators to their positions, determine their responsibilities or establish the procedures they had to follow.  *Id.*  Mr. Lovo was simply responsible for "mak[ing] sure that [the operators are] following their work procedure or just following whatever is written in [the procedures or assignments]." *Id.* at 138:14-16.

12

Mr. Lovo also worked alongside the operators, performing manual labor. He supported them, and he helped them fulfill their individual defined jobs. Ex. 1 (Lovo Depo.), 135:10-12. Specific direction to the operators was dictated by ASR manuals and procedures, or issued by upper management, such as Ryan Wooters. Ex. 1 (Lovo Depo.), 321:21-323:13, 98:4-12, 162:9-18, 138:10-16; Ex. 7 (Ford Depo.), 70:21-71:9.

2.      *Mr. Lovo did not have any authority with regard to hiring or firing.*

ASR presents a creative, *albeit* baseless, argument that Mr. Lovo was directly involved in hiring and firing decision, as the argument goes, he "determine[d] independently how many gangs of longshoremen to hire on any given day and place[d] the orders for those gangs with the ILA locals." ECF 36-1, pp. 1–2, 17–18, 25–26. ASR's claims in this regard seriously misconstrues the actual facts.

In ordering "gangs" of longshoremen, Mr. Lovo was not hiring the associated individuals for employment with ASR. Ex. 9 (Lovo Decl.) ¶ 5. There was not an application process, there were not interviews, and Mr. Lovo in no way extended offers of employment. *Id.* Indeed, the gangs would be comprised of a group of individuals for whom Mr. Lovo had no role in selecting or compiling. *Id.*

Mr. Lovo simply followed a procedure pre-determined by ASR, which dictated how he was to submit orders of gangs of longshoremen for specific shifts. *Id.* at ¶ 6. The ILA Union assigns gangs to ASR that are on standby to work on an as needed basis. *Id.* In ordering the appropriate number of gangs, Mr. Lovo simply adhered to ASR's policy as to the number of gangs to order at each stage of the discharge process. *Id.* at ¶ 7. For example, if eight-million pounds of sugar was being discharged, Mr. Lovo would simply follow a formula pre-determined by ASR for submit the order for an established number of gangs necessary to handle the discharge of the sugar.

*Id.* The longshoremen who made up the gang were not exclusively contracted with or employed by ASR. *Id.* at ¶ 6. As noted, Mr. Lovo had no say in which longshoremen joined a gang or which longshoremen came with a specific gang. *Id.*

At most, Mr. Lovo had the ability to simply submit a *request* that a certain longshoremen not be permitted to return for future assignments. However, a request of this nature was extremely rare, and even on the rare occasions that Mr. Lovo submitted such a request it was typically disregarded. *Id.*; Ex. 1 (Lovo Depo.), 277:13-20. Accordingly, there is no basis for ASR alleging that Mr. Lovo ordering longshoremen constituted hiring. For these reasons alone, ASR's motion alleging the Executive exemption must be denied.

Alternatively, ASR argues that to the extent Mr. Lovo did not actually participate in the hiring process, then his "suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees [were] given particular weight." ECF 36-1, pp. 25–26. However, as shown above, Mr. Lovo had no role whatsoever in the hiring or firing process, and there is no record evidence that his suggestions or recommendations were given particular weight.

Whether an employee's suggestions and recommendations are given "particular weight" is determined by analyzing three factors:

> [1]    Whether it is part of the employee's job duties to make such suggestions and recommendations;
> [2]    The frequency with which such suggestions and recommendations are made or requested; and
> [3]    The frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. To meet this standard, the suggestions and recommendations made must directly affect the employees for whom the supposedly exempt-employee (*arguendo*, Mr. Lovo, in this scenario) was responsible for "customarily and regularly direct[ing]." *Id.* Infrequent or

isolated suggestions or recommendations are sufficient. *Id.* Mr. Lovo does not come close to satisfying this standard.

Mr. Lovo, like almost all employees of ASR, had the option to submit *suggestions* to ASR as to potential hiring or firing issues. Ex. 9 (Lovo Decl.), ¶ 7. However, doing so was not part of Mr. Lovo's primary job duties and very rarely occurred. *Id.* There is no record evidence indicating any such suggestion or recommendation was submitted by Mr. Lovo and then adhered to or given particular weight. *Id.* Irrespective, any suggestions or recommendations which he may have ever made still would not satisfy the standard set forth in 29 C.F.R. section 541.105 for determining "particular weight," which is defined as: "whether it is part of the employee's *job duties* to make such suggestions and recommendations." (emphasis added.)

ASR also argues that Mr. Lovo had extensive decision-making authority impacting the status of other ASR employees. ECF 36-1, pp. 1–2, 17–18, 25–26. ASR attempts to buttress this claim by arguing that Mr. Lovo had a role in reviewing resumes and participating in new hire interviews. *Id.* Mr. Lovo denies this claim. Ex. 9 (Lovo Decl.), ¶ 8. Moreover, Mr. Wooters testified that he has no recollection of there ever being a hiring decision in which Mr. Lovo participated. Ex. 3 (Wooters Depo.), 81:1-83:10, 85:4-9; *see also* Ex. 7 (Ford Depo.), 308:6-309:12. Mr. Michael Moore, ASR's human resources manager, could not identify any instance of Mr. Lovo ever being involved in a hiring or firing decision. Ex. 4 (Moore Depo.), 38:16-41:9 (Q: Can you recall Mr. Lovo ever making any recommendations about firing any employees? A: I cannot); Ex. 3 (Wooters Depo.), 86:3–7.

ASR also argues that Mr. Lovo had the authority to discipline employees. ECF 36-1, pp. 1–2, 17–27. Mr. Lovo denies this allegation and, according to the testimony of Mr. Wooters, Mr. Lovo did not have the authority to issue any type of employee discipline, aside from a rudimentary

"verbal coaching."  Ex. 3 (Wooters Depo.), 87:11-88:15, 93:6-9; Ex. 1 (Lovo Depo.), 139:13-19.

ASR cannot provide a single example of Mr. Lovo ever issuing a written discipline, suspending

an employee, or taking any disciplinary action beyond a verbal coaching (and even issuing a verbal

coaching was rarely done by Mr. Lovo).

ASR argues that Mr. Lovo recommended employees for promotions.  ECF 36-1, pp. 1–2,

18–27.  Mr. Lovo denies he had any role in recommending employees for promotions.  Ex. 9 (Lovo

Decl.), ¶ 9.  Meanwhile, Mr. Wooters testified that he could not recall a single instance in which

Mr. Lovo made a recommendation for an employee promotion.  Ex. 3 (Wooters Depo.), 155:13-

156:2.  Mr. Wooters further testified that Mr. Lovo did not conduct performance evaluations and

did not have any role in setting the wages of the employees Mr. Lovo oversaw.  *Id.* at 155:2-5;

156:3-5.

"The FLSA exemptions are based on actual job functions, not intended responsibilities."

*Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 906 (8th Cir. 2014); *see* 5 C.F.R. §

551.202(e) (Exemptions are based on "duties actually performed by the employee").  Without

being able to demonstrate that Mr. Lovo exercises these authorities as part of his job duties,

genuine issues of material fact exist as to whether Mr. Lovo possessed the requisite authority

required for the Executive exemption to apply.  *See Madden v. Lumber One Home Ctr., Inc.*, 745

F.3d 899, 906 (8th Cir. 2014) (denying summary judgment and stating Defendant was unable to

provide a single example of employees' involvement in the hiring process).

To extent ASR's Motion potentially identifies a few instances in which it argues that Mr.

Lovo made a recommendation or suggestion as to the status of an employee he supervised, the

Regulation states "an occasional suggestion with regard to the change in status of a co-worker" is

not enough to satisfy the frequency requirement.  29 C.F.R. § 541.105.  However, as noted, even

in the instance of these infrequent suggestions, they typically were not followed by ASR.  Ex. 1 (Lovo Depo.), 191:12-192:19.  For all of these reasons, genuine issues of material fact certainly exist as to the application of the Executive exemption and, as such, ASR's Motion must be denied.

3. *Mr. Lovo's primary job duties did not involve management of an enterprise, recognized department or subdivision thereof.*

ASR alleges that Mr. Lovo's primary duty as an employee of ASR was management.  ECF 36-1, pp. 1–2, 22–27.  Mr. Lovo contends that management was not a primary duty of his employment, and genuine issues of material fact now exist as to this issue.

The Regulations to the FLSA define "management" as involving:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  Simply put, Mr. Lovo did not perform duties of a person in management, and to the extent he performed any such duties, they were incidental and certainly did not constitute a primary job duty of his employment.  More specifically, as described above, Mr. Lovo did not interview or select employees for hire, or participate in termination decisions.  Ex. 3 (Wooters Depo.), 81:1-83:10, 85:4-9; *see also* Ex. 7 (Ford Depo.), 308:6-309:12; Ex. 4 (Moore Depo.), 41:7-9; Ex. 3 (Wooters Depo.), 86:3-7.

Mr. Lovo did not train employees, and any involvement he had in this regard consisted of merely distributing training materials and quizzes which were created by ASR.  Ex. 1 (Lovo

17

Depo.), 176:9-177:7; Ex. 3 (Wooters Depo.), 160:18-10. Mr. Lovo did not set or adjust employees' rates of pay. Ex. 3 (Wooters Depo.), 156:3-5. He did not set the hours of other ASR employees. Ex. 9 (Lovo Decl.), ¶ 10. Even on the occasional occurrence of a necessary shift extension caused by production demands, Mr. Wooters was the employee responsible for making the decision in that regard. Ex. 1 (Lovo Depo.), 285:18-21; Ex. 9 (Lovo Decl.) ¶ 10.

Mr. Lovo had a limited and minimal role in creating any production related records. In one instance, he documented a specific problem ASR was experiencing with a member of the ILA labor force who was damaging ASR's equipment. Ex. 9 (Lovo Decl.), ¶ 11. Otherwise, his documentation consisted primarily of dock related records, where Mr. Lovo simply filled in forms and provided other information requested by Mr. Wooters. *Id.* In another extremely limited and narrow instance, Mr. Wooters specifically instructed Mr. Lovo to maintain a log of damage to ASR's equipment, which Mr. Lovo, in turn, created pursuant to his supervisor's instruction. Ex. 1 (Lovo Depo.), 62:4-63:8.

Mr. Lovo did not have any role in planning the work of other employees or determining techniques to be used in performing work. All of these matters were pre-established and directed by policies and procedures created by ASR, and instructions issued by Mr. Lovo's supervisors. Ex. 1 (Lovo Depo.), 98:4-12, 120:15-121:5, 137:15-138:16, 136:19-137:8; Ex. 7 (Ford Depo.), 70:21-71:9.

Mr. Lovo had no role in planning ASR's budget. Ex. 3 (Wooter Depo.), 171:20-172:1; Ex. 9 (Lovo Decl.), ¶ 12. Further, he had no financial control or authority to make any purchases on behalf of ASR. Ex. 9 (Lovo Decl.) ¶ 12. In contrast, Mr. Lovo's supervisor, Mr. Wooters, had extensive purchasing authority, including authority to make equipment purchases up to $25,000,

as well as discretion to spend up to $2,000 on employee travel and $400 on "happy hour" events. Ex. 3 (Wooters Depo.), 70:3–72:21, 162:5–163:7.

The only role Mr. Lovo had in relation to safety was monitoring operators for compliance with ASR's established policies and procedures were.  Ex. 1 (Lovo Depo.), 136:19-138:16. However, as noted, he did not have any role in creating safety policies.  To the extent the policies were not being followed, Mr. Lovo's only options were to issue a "verbal coaching" or report the matter to a supervisor who would have authority to intervene.  *Id.*

In light of the foregoing, it is irrefutable that genuine issues of material fact exists as to whether "management" could possibly be considered amongst Mr. Lovo's primary job duties.  As noted, the three-element test is conjunctive, requiring Mr. Lovo to demonstrate a genuine issue of material fact with regard to only one element.   Irrespective, Mr. Lovo has clearly shown genuine issues of material fact on all three prongs and, as such, ASR's Motion must be denied.

**C.**     ***Mr. Lovo was not exempt pursuant to the Administrative exemption.***

In order for an employer to classify an employee as exempt pursuant to the FLSA's Administrative exemption, the employee's primary job duty must be the "the performance of office or non-manual work directly related to the management or general business operations of the employer" and his or her primary job duty must include "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. 541.200.  Genuine issues of material fact exist as to whether Mr. Lovo meets this standard and, as such, ASR's Motion must be denied.

   1.     *Mr. Lovo's primary job duties did not consist of office or non-manual work directly related to the management or general business operations of ASR.*

The phrase "directly related to the management or general business operations," within the context of the elements of the Administrative exemption, "refers to the type of work performed by the employee."  29 C.F.R. § 541.201(a); *see Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564

F.3d 688, 693 (4th Cir.2009) ("Both the FLSA and its regulations make clear that an employee is exempt based on the *type* of work performed by that individual." (emphasis in original)).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, *for example, from working on a manufacturing production line*[.]" 29 C.F.R. § 541.201(a) (emphasis added).

The regulations provide examples of the type of work that is directly related to management or general business operations, providing illustrations of qualifying work as follows:

> [W]ork in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b) (emphasis added).  And Labor Department comments to the applicable regulations explain that "the administrative operations of the business include the work of employees 'servicing' the business, such as, for example, 'advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.'" *See Defining and Delimiting Exemptions*, 69 Fed. Reg. 22122-01, pp. 22, 138, 2004 WL 865626 (F.R.) (Apr. 23, 2004).[6]

Because section 541.201(a) specifically identifies working on a manufacturing line as an example of work that is not directly related to assisting with the running or servicing of a business, courts analyzing whether the directly related element has been satisfied have often focused their inquiry on whether the work is "production-type" work or analogous thereto.  *See, e.g., Desmond I*, 564 F.3d at 694.  The Fourth Circuit has explained that "[a]lthough the administrative-production

---

[6] Attached hereto as Exhibit "10" are exerts of the applicable pages referenced herein from 69 Fed. Reg. 22122-01. The full text of 69 Fed. Reg. 22122-01 is approximately 259 pages.

dichotomy is an imperfect analytical tool in a service-oriented employment context, it is still a useful construct." *Id.* The critical focus regarding this element is whether an employee's duties involve "the running of a business," *Bratt v. County of Los Angeles,* 912 F.2d 1066, 1070 (9th Cir.1990), as opposed to the mere "day-to-day carrying out of [the business'] affairs." *Id.* at 564 F.3d at 694 (citing *Bratt,* 912 F.2d at 1070) (internal quotes omitted).

The duties Mr. Lovo engaged in were not directly related to the management or the general business operations of ASR. To the extent ASR argues that Mr. Lovo's job duties were "necessary" or "indispensable," that still does not lead to a finding that his job duties were directly related to ASR's general business operations. *See Desmond,* 564 F.3d at 692 ("The indispensability of an employee's position within the business cannot be the *ratio decidendi* for determining whether the position is directly related to the employer's general business operations").

Rather, the analysis focuses upon the type of work performed. *Id.* at 693 ("Both the FLSA and its regulations make clear that an employee is exempt based on the type of work performed by that individual, not whether business practice or applicable law require a particular position to exist"). It is undisputed that Mr. Lovo did not have any role in ASR's budgeting, taxes, company finance, accounting, purchasing, advertising, research, marketing, public relations, all of which are examples of work identified by 29 C.F.R. 541.201 as related to the management of general business operations. Ex. 9 (Lovo Decl.), ¶ 12. As demonstrated in the following exert from Mr. Lovo's deposition, he had no role in directing ASR's business operations; rather, he simply "followed orders":

> Q:    Okay. Have you done anything to ***make the business operate better or more smoothly or more efficiently or more safely***?
> A:    No, sir, I have not made any changes.
> Q:    I didn't ask about changes.

A        I have not made any improvements.
Q:       ***Have you done anything to make things better***?
A:       Sir, when it comes to that, I don't make the decisions. I just follow orders.

Ex. 1 (Lovo Depo.), 162:21-163:9 (emphasis added).

Importantly, as cited in detail above, Mr. Lovo testified clearly and consistently that he expended a significant portion of his day engrossed in manual labor.  *See e.g.*, Ex. 1 (Lovo Depo.), 160:19-161:9.  This testimony was corroborated during the deposition of Mr. Michael Ford, who also worked as Process Supervisor alongside Mr. Lovo.  Ex. 7 (Ford Depo.), 230:11-15, 232:17-233:4, 234:17-19, 235:17-236:7).

In terms of the manual labor which Mr. Lovo performed, he testified to the following: (1) cleaning feeder gates [Ex. 1 (Lovo Depo.), 99:1-10]; (2) manually performing maintenance on belts and shoveling "StayDry" [*Id.* at 99:13-21]; (3) physically cleaning the scale [*Id.* at 100:16-21]; (4) physically cleaning the hopper [*Id.* at 128:6-12]; (5) using a hose to clean machines [*Id.* at 132:1-13]; (6) emptying storage filters [*Id.* at 143:1, 326:16-327:5]; and (7) filling in and performing all of the manual labor for absent operators [*Id.* at 215:14-216:14, 264:7-10; Ex. 7 (Ford Depo.), 180:17-181:8].[7]  Physical labor was undeniably a primary duty and required aspect of Mr. Lovo's position as Process Supervisor.

Mr. Ford testified clearly and unambiguously that Process Supervisors were expected and required to perform manual labor as part of their required job duties.  Ex. 7 (Ford Depo.), 248:19-250:5.  He testified that it was "commonplace" and "routine" to observe a Process Supervisor performing manual labor "with a shovel."  *Id.* at 260:14-19.

---

[7] Beyond the above testimony from Mr. Lovo and Mr. Ford, the physical and manual labor aspects of Mr. Lovo's job were foreshadowed by Mr. Lovo's job offer.  Specifically, Mr. Lovo's initial offer of employment to work as a Process Supervisor for ASR was "contingent upon the satisfactory completion of a pre-placement physical."  Ex. 5 (Offer Letter), Bates no. ASR000004.

Mr. Lovo testified that he often worked alongside and performed manual labor together with the other operators. Ex. 1 (Lovo Depo.), 128:21-129:3; 134:7-13; 135:10-12; 145:1-2. Indeed, on Mr. Lovo's most recent performance evaluation that was conducted by Mr. Wooters and which covered the period of October 2016 through September 2017, Mr. Wooters identified that Mr. Lovo often performs physical work together with operators, as opposed to delegating the manual labor. Ex. 8 (Unsatisfactory Perf. Eval.), Bates nos. 268-271.

ASR's Motion attempts to ignore the fact that Mr. Lovo was consistently engaged in manual labor as a primary duty of employment, arguing instead that Mr. Lovo's "primary duty was office or non-manual work directly related to the management" because he "managed individuals." ECF 36-1, pp. 10–19, 22–33. As ASR's argument goes, Mr. Lovo directed the day-to-day operations at ASR, performed trainings, disciplined employees, and was responsible for accurately tracking employee hours worked. *Id.* ASR is wrong.

As stated in the Executive exemption section of this Opposition, incorporated herein by reference, Mr. Lovo did not "direct" any aspect of ASR's operations. Operators were issued detailed procedures by ASR as to the performance of their respective job duties, to which they were required to adhere. These directives issued by ASR determined the operators' job duties and daily work, not Mr. Lovo who merely monitored for compliance. Ex. 1 (Lovo Depo.), 137:19-138:16. To be sure, Mr. Lovo did not assign job duties to the operators, he merely monitored and assisted them in the actual performance of their job duties. *Id.*

As also demonstrated in the Executive exemption section, above, Mr. Lovo did not train employees. Ex. 1 (Lovo Depo.), 176:9-177:7; Ex. 3 (Wooters Depo.), 160:18-10. As also shown above, and as corroborated by Mr. Wooters, Mr. Lovo's authority to issue any meaningful

discipline required pre-approval by upper management.  Ex. 3 (Wooters Depo.), 87:11-88:15, 93:6-9; Ex. 1 (Lovo Depo.), 139:13-19.

ASR is incorrect in arguing that Mr. Lovo's job duties included ensuring employees "accurately recorded their hours worked."  *See* ECF 36-1, pp. 19, 28.   All individuals who Mr. Lovo supervised were required to independently clock-in and clock-out pursuant to ASR's time-keeping system.  Ex. 1 (Lovo Depo.), 287:10-288:4.   Mr. Lovo was simply responsible for performing data-entry involving inputting the scheduled hours for each week, and thereafter monitoring to ensure that employees actually clocked-in and clocked-out as required by ASR policy.  *Id.*  Indeed, the ILA Union provided an individual who was responsible for tracking the hours worked by the longshoremen who performed work for ASR and who Mr. Lovo oversaw. Ex. 9 (Lovo Decl.) ¶ 5.

Lastly, ASR alleges that Mr. Lovo had the authority to determine when maintenance should be performed on ASR's machinery.  ECF 36-1, pp. 1, 8, 12–13, 29–30, 32.  This argument is simply not true.  When a maintenance concern arose within a department that Mr. Lovo was supervising, he would simply inform the maintenance department of the issue.  Ex. 1 (Lovo Depo.), 147:1-8; 178:21-179:21, 184:1-185:8.  From there, it was up to the maintenance department and Mr. Wooters to decide when the maintenance or other necessary action, if any, would be performed.  *Id.*

ASR attempts to present an analogy between, on the one hand, Mr. Lovo's work at ASR, and, on the other hand, that of "work-planners" at nuclear power plants who developed plans for maintenance and repairing machines, but who did not personally perform the manual labor upon implementation of those plans.  ECF 36-1, pp. 30–31 (citing *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365).  The *Kennedy* case and any resulting analogy is inapposite.  As confirmed by

24

Mr. Wooters, Mr. Lovo did not develop work plans as part of his primary duties. Ex. 3 (Wooters Depo.), 107:3-15; Ex. 9 (Lovo Decl.) ¶ 13. Rather, Mr. Lovo received work orders from ASR and management, communicated the orders, monitored for compliance, and then simply reported back any issues of non-compliance. Ex. 1 (Lovo Depo.), 98:4-12, 121:2-5, 321:21-322:13.

There are genuine issues of material fact as to whether there is even *one occasion* over the course of Mr. Lovo's more than two-years of employment wherein any of the matters he communicated actually included the development of any type of plans . Ex. 1 (Lovo Depo.), 271:4-17. Ex. 3 (Wooters Depo.), 105:4-17. In the one disputed occasion identified by ASR, Mr. Lovo was involved primarily in the physical implementation of the plan, not the planning itself. Ex. 1 (Lovo Depo.), 271:4-17. Rather, Mr. Lovo was more commonly involved in performing orders issued by management, which required the performance of manual labor. Ex. 1 (Lovo Depo.), 271:4-17. Ex. 9 (Lovo Decl.) ¶ 14. As a result, the *Kennedy* case has no application.

When an employee's "job is to generate [*i.e.*, produce] the very product or service that the employer's business offers to the public" that employee "can be considered a production employee as distinguished in the exemption." *Desmond*, 564 F.3d at 694. Mr. Lovo's job was to generate and produce sugar, which ASR is in the business of offering to the public.

Mr. Lovo's job duties were akin to a floater on a production line, which is specifically excluded from the exemption by 29 C.F.R. section 541.201. As noted, Mr. Lovo was involved in manual, physical, day-to-day tasks, not the running of ASR's business. *See Desmond*, 564 F.3d at 694 (stating that while performing certain critical duties may be "important to the operation of the [businesss]" those job duties "are unrelated to management or the general business functions of the company" and recognizing that instead the work did not qualify for the Administrative

exemption because it consisted of tasks somewhat similar to those performed 'on a manufacturing production line or selling a product in a retail or service establishment'").

Mr. Lovo's primary job duty was to produce or assist in the production of sugar, and his primary job duty undeniably consisted of production work. Accordingly, ASR's Motion must be denied.

2. *Mr. Lovo's primary job duties did not involve the exercise of discretion and independent judgment with respect to matters of significance.*

The exercise of discretion and independent judgment requires the "comparison and evaluation of possible courses of conduct, and acting or making a decision after various possibilities have been considered." 29 C.F.R. 541.202(a). Further, an employee must have the authority to "make an independent choice free from immediate direction or supervision." *Id.*

In considering whether an employee exercises discretion and independent judgment regarding matters of significance, the following factors are analyzed:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. 541.202(b). To qualify for the Administrative exemption, an employee is required to do more than simply engage in the application of, "well-established techniques, procedures, or specific standards described in manual or other sources." 29 C.F.R. § 541.202(e).

Mr. Lovo did not exercise independent judgment or discretion in the performance of his job duties.  As shown above, Mr. Lovo received all of his orders and instructions from Process Managers, such as Mr. Wooters, "Unit One" supervising employees, and related and/or more senior members of management.  Ex. 9 (Lovo Decl.) ¶ 15.  As a Process Supervisor, Mr. Lovo did not exercise independent judgment as to the work that should be performed on a given shift.  Ex. 7 (Ford Depo.), 70:21-719.  Mr. Lovo provided consistent testimony that he was not even the most senior level of management on a standard work shift; rather, the "Unit One" was the senior member and the person who would have the ability to exercise independent judgment:

> Q:       And when you are working, are there any other supervisors who share responsibility for the Wash House or the ion exchange, or is it one supervisor on duty at any one time?
>
> A:       No, you also have the Unit One, which is the person who is above me, and they mainly take care of the Pan House. However, they oversee the whole operation, and [the Unit One is] also letting me know if he wants to make changes or whatever needs to be done.  So I also follow instructions from [the Unit One, and] I get instructions from him as well[.]

Ex. 1 (Lovo Depo.), 150:19-151:9.  Indeed, there was always someone present to oversee Mr. Lovo, give him specific work instructions, and to whom he was required to report:

> Q:       [Ex. 1 (Lovo Depo.), 88:20] So, as a process supervisor responsible for the dock operations, you're basically responsible for, the what they call the discharge, which is the unloading of the raw sugar off the ships; is that correct?
>
>                              *        *        *
>
> A:       [*Id.* at 89:10] What I was doing, what I do, I go on the ship, look at the product. I speak to the chief mate. The chief mate instructs me on what to do, because we can't take decisions while we're on the ship. It's his ship, so I just follow his instructions as to where we're going to go and what we're going to discharge . . . [*Id.* at 98:4] So, when the ship comes in, you know, it docks alongside. We get what's called a discharge statement. That's what we need to follow. Basically, I can't decide, you know, I'm going to go into hold number one, number five. That's all given to us, so I just follow those procedures.  I tell the crane operators, hey, guys, you're going to go into this hold, you're going to go into that hold.  So, I go in there and talk to the chief mate, make sure we're still clear on that. If there are any changes to be made, [the chief mate] will at that point advise me and say, you know what, I want to change the discharge sequence. We always have

27

to follow [the chief mate's] lead. We can't make any decisions. That's [the chief mate's] ship. He decides what we do on it. The crane operators go up. A lot of times they might call me and say, hey, Vlad, I'm having problem with my feeder gate, you know, not opening. So I have to go up there, clean their feeder gate, try and get it open. If it doesn't open, at that point, you know, I will ask a mechanic to go look at it, but most of the time, you know, you just need to clean it up, shovel a little bit of sugar in there, throw some hot water, and, you know, in order to get it open. So, during that time, the scale man is preparing everything else that he needs to prepare. Belts, when you first start belts, you need to, you need to -- especially in the wintertime, you need to put StayDry in there so the belts don't track off. So what I do is I go to one end, and the other guy would go to the other end, two opposite ends, because we do that where the ends are. So, I'm putting StayDry in there, shoveling the StayDry in there, and he's doing the other end. And basically we're just communicating through radios, is everything okay, yeah, I'm fine back here. We just want to make sure the belt doesn't track off because, if it does, it's a big hassle. We could be down all day. So, once we do that, you know, we might go on the scale and go on there, make sure that, you know, it's clean, making sure that the tare weight is down . . . [*Id.* at 100:16] So, we clean the scale. You know, it's, a big scale, so it would take them forever to get it done. So, normally I take one floor. He goes to the other one. We do the corners and make sure that the whole scale is clean. . . . then, once everything is good to go, we put StayDry on the belts. We clean the, the scale. At that point then we're ready to start [the discharge process]. We normally start at 7:00 a.m., discharge. A lot of times Mr. Wooters will instruct me to start early. We might start as early as 5:00 o'clock. In that case, we've just got to arrive way earlier in order to start at 5:00 a.m., so it – the start time might vary depending on what Mr. Wooters instructs me.

Ex. 1 (Lovo Depo.), 88:20–101:13, *see also* 150:19-151:9.

Mr. Lovo was not authorized to implement any changes without first receiving a direct order from his manager.  *Id.* at 162:21-163:9.  Indeed, he was not responsible for taking *any* initiatives for the purpose of "driving results."  *Id.* at 181:15-18 (Q: Have you taken the initiative to drive results in any way? A: No, sir, I'm not going to do something that I haven't been asked to do).

Mr. Lovo did not even perform any work which, from an administrative perspective, could be construed as "adding value."  On this topic, he testified as follows:

> Q:      Okay. When you worked on the dock operation, did you do anything to add
>          value to the business?

28

| | |
|---|---|
| A: | First of all, sir, I cannot make any decisions or change anything without the approval of my boss, so, no, I did not make any changes. |
| Q. | I'm asking if you added any value at all? |
| A: | Other than what's established and what I was already doing, no, I just did what I was supposed to do. |
| Q: | What was that? What were you supposed to do? |
| A: | What we discussed earlier, getting sugar off the ship. |

*Id.* at 156:9-157:1.  While Mr. Lovo could identify problems, he was not authorized to exercise discretion in resolving the problems.  *Id.* at 311:17-313:1 (with regard to resolving an identified problem: "I need to get his permission. I can't make that decision on my own"), 345:5-20; Ex. 7 (Ford Depo.), 219:14-220:1.  For all issues that arose, Mr. Lovo was required to report those matters to either his manager or the Unit One, whether that individual was on-site or off-site and therefore available on-call.  Ex. 1 (Lovo Depo.), 125:14-17; 293:16-294:4, 317:4-7, 323:3-5).

Mr. Lovo testified consistently and repeatedly that he simply followed the instructions that were given to him and adhered to ASR's procedure.  *Id.* at 157:9-11, 162:9-163:9 (Q: Have you done anything else to contribute to the safe operation of the Baltimore refinery? A: I just follow whatever safety policies are written in there, and that's what -- I just, that's what I follow, sir).

Mr. Lovo received a stern and negative reaction from his manager when, in one isolated instance, he used his discretion to deviate from established ASR procedure and elected to send an injured employee to a clinic:

I sent him to the clinic to get checked . . . However, I did not call the safety manager. The protocol is, you call the safety manager to make him aware of what happened. He will then decide if I need to send that employee to the clinic or he would instruct me otherwise on what to do, and then I inform my supervisor, which in this case was Mr. Ryan [Wooters]. So, I thought I was doing the right thing by sending him to the clinic and doing what, what was supposed to be done. But then, you know, I failed to inform my, my superiors on that, and, and that day I never felt so bad the way I was talked to by the plant manager . . . [290:7] Like I said, that was a big mistake for not notifying my supervisors . . . that was a big, big mistake, and I learned from that mistake. So that's why, from the now on, I always report everything.

*Id.* at 256:0-257:5, 290:7-291:6

ARS argues that Mr. Lovo "had discretion to determine how to most efficiently discharge raw sugar off of a ship." ECF 36-1, pp. 10, 32. In contrast, Mr. Lovo testified that he had no such discretion, and he simply was issued a discharge order that specified exactly how he was to discharge the sugar:

> So, when the ship comes in, you know, it docks alongside. We get what's called a discharge statement. That's what we need to follow. Basically I can't decide, you know, I'm going to go into hold number one, number five. That's all given to us, so I just follow those procedures.

Ex. 1 (Lovo Depo.), 98:4-9. Accordingly, Mr. Lovo did not make decisions as to the discharge of sugar, he merely communicated and implemented decisions issued by ASR. *Id.*

Every action of significance taken by Mr. Lovo had to be approved or ordered by an upper level of management or, alternatively, routine maintenance and common day-to-day events were determined according to ASR policies and manuals. Ex. 1 (Lovo Depo.), 98:4-12; 120:15-121:5; 137:15-138:16; Ex. 7 (Ford Depo.), 70:21-71:9; Ex. 9 (Lovo Decl.) ¶ 15. Mr. Lovo did not have the discretion to waive or deviate from ASR practices and policies. *See id.*

In addition, Mr. Lovo did not have any control, authority, or influence over the financial aspects of ASR. Ex. 9 (Lovo Decl.) ¶ 12. He did not have a company credit card or any spending authority on behalf of ASR. *Id.*; Ex. 3 (Wooters Depo.), 161:16–18 (stating Mr. Lovo did not have an ASR credit card), *cf.* Ex. 3 (Wooters Depo.), 70:3–72:21, 162:5–163:7 (describing Mr. Wooters' own authority to make purchases up to $25,000). Mr. Lovo could not negotiate on behalf of or bind ASR in any matters of significance. Ex. 9 (Lovo Decl.) ¶ 12.

Further, the only evidence of Mr. Lovo's ever having involvement in an employee grievance proceeding was with regard to *one occasion* when ASR specifically asked him to attend a grievance hearing. Ex. 9 (Lovo Decl.) ¶ 16. ASR argues that Mr. Lovo had authority to shut

down "part or all of the Baltimore Refinery when he determined it was warranted by safety concerns" (ECF 36-1, pp. 10, 16–17, 32); however, Mr. Lovo states decisions of this nature could only be made by upper management or maintenance.[8]  Ex. 9 (Lovo Decl.) ¶ 17.

ASR also argues that Mr. Lovo had discretion in ordering of ILA gangs.  ECF 36-1, pp. 9–10, 17–18, 19, 25–26, 28–29, 33.  As explained in detail above, Mr. Lovo did not have any discretion in this regard, as there were either policies dictating how many individuals or "gangs" were to be order for each stage of the discharge.  Otherwise, in order to deviate from this policies Mr. Lovo was required to obtain supervisor approval (*e.g.*, from Mr. Wooters), and then Mr. Lovo would simply submit the corresponding order.  Ex. 1 (Lovo Depo.), 278:8-282:8.

For all of the above reasons, there are genuine issues of material fact as to whether Mr. Lovo was properly classified under the Administrative exemption by ASR.  Accordingly, ASR's Motion must be denied.

**D.**     ***Mr. Lovo's duties did not satisfy the primary duty requirements of the Executive or the Administrative Exemption.***

Even assuming, *arguendo*, that any of the minimal "supervisory duties" performed by Mr. Lovo could be considered "work directly related to the management or general business operations of the employer" or viewed as "the exercise of discretion and independent judgment with respect to matters of significance," it is undeniable that genuine issues of material fact exist as to whether these were his *primary job duties*, as is required for the exemption to apply.  Simply engaging in non-manual work—or engaging in narrowly defined instances of exercising independent

---

[8] ASR's argument regarding Mr. Lovo's discretion with regard to matters of "safety" relies almost entirely upon the testimony of Mr. Kelly DeAngelo, who lacks personal knowledge as to the work performed by Mr. Lovo.  ECF 36-1, pp. 16-17; *see* ECF 38 (Lovo Motion to Strike).  The only testimony that ASR cites from Mr. Lovo on this topic is that he was responsible for ensuring that employees were "working safe and wearing the proper PPE [personal protective equipment]."  ECF 36-1, p. 16.  ASR cannot cite to any admissible testimony or record evidence demonstrating that Mr. Lovo had the authority to shut down ASR's Baltimore Refinery, and Mr. Lovo denies this allegation.

31

discretion or performing management activities—does not satisfy either of the exemptions' primary duty requirements. 29 C.F.R. 541.700 (listing five factors for establishing a primary duty).

Mr. Lovo's primary job duty was performing manual labor and monitoring his department for satisfying ASR's pre-determined production goals, not engaging in activities that determined if the business succeeded. Ex. 1 (Lovo Depo.), 350:11-21; 175:7-9; Ex. 9 (Lovo Decl.) ¶ 4. Mr. Lovo's non-exempt duties, as described above, were his primary job duties. *Id. at ¶ 27.* For example, Mr. Ford testified that a clogged drain could result in the first floor of the Refinery flooding, and that the operators would not resolve these clogs because they had other responsibilities; therefore, Process Supervisors, such as himself and Mr. Lovo, were responsible for manually unclogging drains. Ex. 7 (Ford Depo.), 245:9-247:13. The manual labor Mr. Lovo performed alongside the operators was critical and an essential aspect of keeping ASR's operation running. *Id.*

In contrast, if Mr. Lovo did not perform the minor aspects of his job duties which involved supervision, then there were other supervisors on his shift that guide the system and provide any necessary oversight. Ex. 9 (Lovo Decl.) ¶ 18. Additionally, individual operators knew how to do their specific jobs and typically could operate without supervisor oversight.[9] *Id.* This is due, in part, to the fact that operators were required to follow ASR's established procedures, thereby needing little in the form of managerial oversight from Process Supervisors. *Id.*

Only if something was out of the ordinary did Mr. Lovo need to communicate special directions, which Mr. Lovo in turn received from more senior levels of management. *Id.* Mr. Lovo was necessary to the operation as an extra operator and a communicator, not for the purpose

---

[9] As shown above, rather than requiring managerial oversight in order to perform their respective jobs, the operators required additional "man power" in order to perform their physical jobs. As the Process Supervisor, this is the type of manual and physical assistance Mr. Lovo typically provided.

of performing traditional "management" responsibilities.  *Id.*  If an operator was not performing his job duties, the production could stop or stall; however, if Mr. Lovo was not performing any of his limited supervisory duties, each employee would still generally be able to function and perform their task.  *Id.*  Mr. Wooters informed Mr. Lovo that he does not even need to be present to provide oversight throughout a given shift.  Ex. 6 (Wooters email), ASR000111, ("My question to you is, why do you have to be here everyday in order for the dock to run?").

Mr. Lovo's managerial duties were few and far between, while his non-exempt duties, including regular manual labor, were frequent and essential.  When the non-exempt work performed is of greater importance than the exempt work, the employee cannot be classified as exempt.  *See Pierce v. Dolgencorp, Inc.*, No. 3:09CV079, 2011 WL 398366, at *8 (M.D.Pa. Feb. 3, 2011) (denying summary judgment on employer's claim of FLSA exemption and stating "one logical way of addressing this factor is to imagine how the store would function if the employee did not perform her non-managerial duties").

Mr. Lovo was always supervised and was not free to make his own decisions or use his own discretion in any matters of significance.  Ex. 1 (Lovo Depo.), 89:10-17; 98:4-12; 120:15-121:5; 137:15-138:16; 150:19-151:9; 156:12-14; 162:21-163:9; 256:10-257:5; 294:5-10.  He took orders from his managers, without deviation.  *Id.* at 98:4-12; 150:19-151:9; 156:12-14; 157:9-11; 162:21-163:9; 294:5-10.  He was required to follow ASR's established procedures, and would be reprimanded for failing to do so.  Ex. 1 (Lovo Depo.), 256:0-257:5; 290:7-291:6.

Mr. Lovo expended the majority of his time performing non-exempt job duties which were the same or extremely similar to the non-exempt duties performed by the operators he oversaw. *Id.* at 128:21-129:3; 134:7-13; 135:10-12; 145:1-2).; Ex. 7 (Ford Depo.), 260:14-17; Ex. 8 (Unsatisfactory Perf. Eval.), Bates nos. 268-271 (stating, *inter alia*, Mr. Lovo "shows little ability

to delegate . . . often times performs work himself rather than delegate . . . continually relies on his peers and subordinates to make decisions in regard to the process").

ASR repeatedly references Mr. Lovo's salary and declares that while "ASR paid Lovo an annual salary in excess of $70,000 . . . he claims in this lawsuit that he deserved more."  ECF 36-1, pp. 2, 5, 21.  ASR fails to acknowledge, however, that Mr. Lovo was paid *less* than the individuals he supervised, despite performing largely the same non-exempt work.  Ex. 1 (Lovo Depo.), 160:19-161:15 ([161:12] "As a matter of fact, I should be getting paid more because the people that are under me, they make over six figures a year"); *see* 29 C.F.R. § 541.700 ("If such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement").

When taken together, all of these factors demonstrate numerous genuine issues of material fact as to whether Mr. Lovo was an exempt employee.  For these reasons, ASR's Motion must be denied.

**E.**     ***Genuine issues of material fact exist on Mr. Lovo's MWPCL and MWHL claims.***

For all of the reasons stated above, genuine issues of material fact exist as to whether Mr. Lovo was properly classified as an exempt employee under not only the FLSA, but also with regard to the MWHL and MWPCL.  Mr. Lovo contends, and has supported with citation to record evidence, that he was misclassified by ASR as an exempt employee.  As a result, Mr. Lovo's claims under the MWHL and MWPCL cannot be summarily dismissed.  Due to the improper classification of Mr. Lovo, ASR failed to provide Mr. Lovo with the wages he was entitled to and violated the MWPCL by unlawfully withholding Mr. Lovo's wages.[10]

---

[10] Mr. Lovo has plead in his complaint that he regularly worked overtime hours and far in excess of 40 hours in a workweek, and ASR's Motion does not challenge Mr. Lovo's complaint in this regard.

The MWPCL provides for treble damages to be awarded to a plaintiff when the unlawful withholding of wages is not the result of a *bona fide* dispute.  As described in detail in earlier parts of this Opposition, there can be no *bona fide* dispute that Mr. Lovo was non-exempt and therefore misclassified.   Alternatively, genuine issues of material fact certainly exist in this regard. Accordingly, for all of the reasons stated throughout this Opposition, ASR's Motion must be denied in its entirety, including with regard to Mr. Lovo's claims asserted pursuant MWHL and MWPCL.

## V.      CONCLUSION

Extensive disputes as numerous genuine issues of material fact exist as to all of ASR's arguments that Mr. Lovo was properly classified as an exempt employee.  Accordingly, Mr. Lovo respectfully requests that the Court deny ASR's Motion for Summary Judgment.


Dated: March 28, 2018                                     Respectfully submitted,

                                          ____ /s/  *Judd G. Millman*____
                                          Judd G. Millman (Fed Bar No. 18212)
                                           judd@luchanskylaw.com
                                          **LUCHANSKY LAW**
                                          606 Bosley, Suite 3B
                                          Towson, Maryland 21204
                                          Telephone: (410) 522-1020
                                          Facsimile: (410) 522-1021
                                          *Attorneys for Plaintiff*


### CERTIFICATE OF SERVICE

I, hereby, certify that on March 28, 2018, a copy of the foregoing was served via the United States District Court for the District of Maryland's electronic filing system upon all counsel of record registered to receive such notifications.  **In addition, due to the length of this filing, I certify that a paper copy has been sent *via* U.S. First Class mail to the Court Clerk.**


                                   _____ /s/ _____
                                     Judd G. Millman