## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HELDER VLADIMIR LOVO | * | |
| | * | |
| v. | * | Civil No. RDB-17-418 |
| | * | |
| AMERICAN SUGAR REFINING, INC. and | * | |
| RYAN WOOTERS | * | |
| | * | |

********

## MEMORANDUM

Plaintiff Helder Vladimir Lovo ("Lovo") brings this lawsuit against defendants American Sugar Refinery ("ASR") and Ryan Wooters ("Wooters") for alleged violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et. seq.*; the Maryland Wage and Hour Law ("MWHL"), MD. CODE ANN., LAB. & EMPL. § 3-401 *et. seq.*; and the Maryland Wage Payment and Collection Law ("MWPCL"), MD. CODE ANN., LAB. & EMPL. § 3-501 *et. seq.* Now pending are plaintiff's motion for sanctions (ECF No. 38), defendants' motion to strike (ECF No. 48), defendants' motions for summary judgment (ECF No. 36, 37), and plaintiff's motion for partial summary judgment (ECF No. 40). The motions are fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons below, defendants' motions for summary judgment are granted, and plaintiff's motion for partial summary judgment, plaintiff's motion for sanctions, and defendants' motion to strike are denied. Judgment shall be entered in favor of both defendants ASR and Wooters and against plaintiff Lovo.

## BACKGROUND

This dispute concerns defendants ASR's and Wooters' alleged wrongful failure to pay overtime compensation to plaintiff Lovo during Lovo's employment with defendants. Lovo was employed by ASR, a refiner and seller of sugars and other sweeteners, from September 28, 2015

to November 24, 2017 as a Process Supervisor at ASR's Baltimore Refinery.  ECF No. 36-3, DeAngelo Decl. ¶ 3; ECF No. 36-4, Lovo Tr. 18:5-9, 55:10-14; ECF No. 36-5, Moore Decl. ¶ 3. As a Process Supervisor, Lovo reported to a Process Manager, who in turn reported to the Refinery Manager.  ECF No. 36-4, Lovo Tr. 87:5-9; ECF No. 36-3, DeAngelo Decl. ¶ 13-14. From June 2016 through the termination of Lovo's employment, Wooters was the Process Manager to whom Lovo reported.  ECF No. 36-4, Lovo Tr. 93:3-11.  Wooters in turn reported to the Refinery Manager, Kelly DeAngelo ("DeAngelo").  ECF No. 36-3, DeAngelo Decl. ¶ 14.

The Process Department at ASR's Baltimore Refinery is divided into five areas of operation: (1) the dock operations, where raw sugar is unloaded from ships and stored in sheds, (2) the Wash House, where raw sugar is rid of impurities and color, (3) the Filter House, where sugar is filtered further through an ion exchange process and carbon filters, (4) the Pan House, where sugar is filtered again, recrystallized, and sent to driers, and (5) a specialty products operation, where sugar is refined for pharmaceutical use.  ECF No. 36-3, DeAngelo Decl. ¶¶ 7-12.  From September 2015 to December 2016, Lovo served as the Process Supervisor for the dock operations.  From December 2016 through the end of his employment with ASR in November 2017, Lovo served as the Process Supervisor for the both the Wash House and the Filter House.  ECF No. 36-4, Lovo Tr. 16:17-20, 88:7-10, 148:3-8.

The description for the Process Supervisor position lists the following duties: direct sugar refining operations; direct teams of specialized employees ensuring good manufacturing practices and safe operating procedures; and achieve standard production volume, quality standards, and regulatory compliance through the supervision of hourly personnel (up to 30) on rotating shifts.  ECF No. 36-5, Ex. 1.  As Process Supervisor of the dock operations, Lovo supervised approximately seventeen to twenty employees, including five full-time operators and

twelve to fifteen longshoremen.[1]  ECF No. 36-4, Lovo Tr. 87:14-88:6, 90:19-91:13.  His role was to manage the process of discharging raw sugar from cargo ships, which required cranes and heavy equipment to transport the sugar from the holds of the ships into storage sheds.  *Id.* at 88:11-90:4.  As Process Supervisor of the Wash House and the Filter House, Lovo supervised approximately five full-time operators.  *Id.* at 325:6-326:4.  In this role, he managed the refining process to ensure the sugar production goals were met.  *Id.* at 175:7-9.

Based on these job duties, ASR characterized Lovo as an exempt executive and administrative employee under the FLSA and MWHL.[2]  Therefore, Lovo was not paid overtime compensation.  Lovo disputes this characterization, claiming he was nothing more than "the point of communication" between upper management and individuals working as operators.  ECF No. 39, p. 2.

Accordingly, Lovo filed suit against ASR in this Court on February 14, 2017.  ECF No. 1.  Lovo amended his complaint on August 30, 2017, adding Wooters as an additional defendant.  ECF No. 13.  Lovo alleges three counts against ASR and Wooters as his employers based on their failure to pay overtime: (1) violation of the FLSA, (2) violation of the MWHL, and (3) violation of the MWPCL.  On February 26, 2018, ASR and Wooters each filed a motion for summary judgment arguing that Lovo was at all relevant times an exempt employee under the applicable law.[3]  ECF No. 36, 37.  In response to Wooters' motion for summary judgment, Lovo filed a motion for partial summary judgment.  ECF No. 40.  Additionally, the parties have filed two discovery-related motions.  First, Lovo filed a motion for sanctions against ASR on March

---

[1] Longshoremen perform the required manual labor inside the holds of the ships to ready the sugar for discharge.  ECF No. 36-3, DeAngelo Decl. ¶¶ 26-27.
[2] 29 U.S.C. § 213; MD. CODE ANN., LAB. & EMPL. § 3-403.
[3] Wooters also argues that he was not Lovo's employer for the purposes of the FLSA and MWHL.

28, 2018.  ECF No. 38.  Second, ASR and Wooters filed a motion to strike on April 27, 2018.[4]
ECF No. 48.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment "if
the pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."  *See Anderson v. Liberty Lobby Inc.*, 477 U.S.
242, 247 (1986).  A genuine issue of material fact exists where, "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking
summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of
material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When reviewing a motion
for summary judgment, the court must take all facts and inferences in the light most favorable to
the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party opposing summary judgment must, however, "do more than simply show that
there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633
(4th Cir. 1999).  The non-movant "'may not rest upon the mere allegations or denials of [his]
pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for
trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)
(alteration in original) (quoting Fed. R. Civ. P. 56(e)); *see also Adickes v. S. H. Kress & Co.*, 398
U.S. 144, 160-61 (1970).  A court should enter summary judgment when a party fails to make a

---

[4] This case was reassigned from Judge J. Frederick Motz to the undersigned on July 10, 2018.

showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23.

## ANALYSIS

### I.  Discovery-Related Disputes

As an initial matter, the parties raise numerous issues related to discovery.  Lovo moves for sanctions against ASR, requesting that this court (1) strike confidentiality designations from ASR's discovery production and strike the documents themselves, (2) strike two exhibits attached to ASR's motion that were not produced in discovery, and (3) strike the "Declaration of Kelly DeAngelo" submitted and relied upon by ASR (ECF No. 36-3).  ECF No. 38.  ASR and Wooters move to strike the "Statement of Michael Ford" submitted and relied upon by Lovo (ECF No. 39-13).  ECF No. 48.  For the following reasons, both motions are denied.

#### A.  Confidentiality Designations

First, Lovo contends ASR improperly designated 943 pages of produced documents as confidential in violation of this court's discovery order.  Pursuant to Federal Rule of Civil Procedure 37, Lovo requests that this court (1) strike the confidentiality designations from all of ASR's discovery production, (2) strike specific documents designated as confidential and attached to ASR's motion and prevent ASR from relying upon them as evidence in support of its motion, and (3) order ASR and/or its counsel to pay Lovo's attorneys' fees incurred in asserting this motion.  ECF No. 38-1, p. 21.

On July 31, 2017, ASR produced 156 documents in response to Lovo's first discovery request.  ECF No. 38-1, ¶ 1.  On August 15, 2017, Lovo submitted to ASR supplemental discovery requests, in response to which ASR produced an additional 367 documents.  *Id.* at ¶ 2. On September 8, 2017, Lovo submitted a third request for documents.  *Id.* at ¶ 4.  In response to

this request, ASR informed Lovo that it needed a protective order before making the production

because of the confidential nature of the documents requested.  *Id.*  Accordingly, the parties

signed and submitted to this Court a proposed discovery order regarding confidentiality.  *Id.* at ¶

5; ECF No. 23.  This Court signed the order (the "Confidentiality Order") on November 9, 2017.

ECF No. 26.

> In relevant part, the Confidentiality Order instructs,
>
> The designation of confidential information shall be made by placing or affixing
> on the document…the word 'CONFIDENTIAL.' One who provides material may
> designate it as 'CONFIDENTIAL' only when such person in good faith believes
> it contains sensitive personal information, trade secrets or other confidential
> research, development, or commercial information which is in fact confidential.
> A party shall not routinely designate material as 'CONFIDENTIAL,' or make
> such a designation without reasonable inquiry to determine whether it qualifies
> for such designation.

ECF No. 26, ¶ 1(a).  Additionally, the Confidentiality Order requires that documents designated

as confidential that need to be filed with the court be filed under seal.  *Id.* at ¶ 2.  The

Confidentiality Order allows either party to challenge a designation of confidentiality upon

motion, placing the burden of proving the confidentiality on the party asserting confidentiality.

*Id.* at ¶ 4.  If such a motion is granted, the moving party is entitled to attorneys' fees pursuant to

Federal Rule of Civil Procedure 37(a)(5) unless "(i) the movant filed the motion before

attempting in good faith to obtain the disclosure or discovery without court action; (ii) the

opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other

circumstances make an award of expenses unjust."  *Id.*

After the Confidentiality Order was signed, ASR produced 943 pages of documents, each

of which it designated as "CONFIDENTIAL."  ECF No. 38-1, ¶ 6.  Lovo claims ASR over-

designated documents as confidential and asserts that each of the 943 pages was improperly

designated as confidential.  *Id.* at ¶¶ 6-7.  This over-designation allegedly prejudiced Lovo

because it required Lovo to file any designated documents on which it relied in its motions

briefings under seal.  *Id.* at ¶ 10.  Meanwhile, ASR failed to file under seal designated documents

on which it relied in its briefings.  *Id.*

ASR bears the burden of proving the confidentiality of the documents disputed by Lovo.

This Court need not, however, engage in the task of combing through 943 pages of documents to

determine whether ASR has met its burden.  The production at issue consisted of company

emails[5] and personal cell phone records, characterized by ASR as confidential "commercial

information" and "sensitive personal information."  ECF No. 42, p. 4; ECF No. 42-1 (describing

the need for a protective order because the requested emails "include[d] confidential information

about the operation of ASR's business").  Because the documents produced consisted of business

emails and personal phone records, ASR did not violate the Confidentiality Order by designating

these documents as confidential.  Thus, Lovo's motion is denied with respect to the designations.

Moreover, even if ASR's designations violated the Confidentiality Order, the

designations were substantially justified.  Additionally, ASR offered to re-evaluate and negotiate

any documents that Lovo wished to attach to its briefings.[6]  Accordingly, sanctions are

unnecessary.

---

[5] Lovo stakes much of his argument on the fact that some blank pages and pages containing only
ASR's company logo were designated as confidential.  These pages were not standalone
documents, but were rather part of individual emails determined by ASR to be confidential as a
whole.  ASR made its designations on a "document-by-document basis, rather than a page-by-
page basis," which resulted in designations appearing on blank pages or pages only containing
ASR's name and logo that were part of larger emails.  ECF No. 42, p. 4.  This document-by-
document approach does not constitute a violation of the Confidentiality Order, even though
some pages within a larger document were not confidential.

[6] Both parties expressed a willingness to confer to resolve the problem of confidentiality
designations.  In its opposition, ASR "offer[ed] to reassess the confidentiality of any documents
that [Lovo] would like to file in the public record."  ECF No. 42, p. 6.  The parties apparently
began discussions regarding amending the confidentiality designations, but plaintiff was, as of
the date of his reply brief, waiting for defense counsel to respond to plaintiff's counsel's most

### B.  Exhibits Not Produced in Discovery

Second, Lovo requests two exhibits attached to ASR's motion for summary judgment be stricken because they were not produced in discovery.  The first exhibit is an email chain between Lovo and DeAngelo dated November 19, 2017 (the "November 19 Email").  ECF No. 36-3, Ex. 1.  The second exhibit is an email from Lovo announcing his resignation dated November 24, 2017 (the "November 24 Email").  ECF No. 36-5, Ex. 3.  Lovo contends these emails should have been produced during discovery in response to three of Lovo's document requests.  ASR made its production in response to the three relevant requests on November 10, 2017, at which time the emails in question did not yet exist.  ASR did not supplement its production with these emails at a later date.

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The court may also, "on motion and after giving an opportunity to be heard," impose other sanctions. Fed. R. Civ. P. 37(c).  District courts have broad discretion to determine whether a party's non-disclosure of evidence is substantially justified or harmless.  *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).  The Fourth Circuit has announced five factors to guide this analysis:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

recent communication. Because both parties expressed willingness to resolve this issue on their own, that is the course of action they should have taken.

*Id.* (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003)).  The non-disclosing party bears the burden of establishing these factors, but courts are "not required to tick through each of the factors" in explaining their analyses.  *Id.* (emphasis deleted).

ASR's failure to disclose the November 19 and November 24 emails was harmless.  First, these emails were of no surprise to Lovo given that the emails were either sent by or received by Lovo while this litigation was pending.  ECF No. 36-3; ECF No. 36-5.  Second, because there was no surprise, there was no need for Lovo to cure the surprise.  The third factor concerning disrupting trial is irrelevant because today's decision on the summary judgment motions closes this case.  Fourth, both exhibits are of minimal importance.  It is undisputed that the November 24 Email in which Lovo announced his resignation is "of minimal consequence."  ECF No. 38-1, p. 21; ECF No. 42, p. 8.  The November 19 Email is more important as it serves as evidence of the type of decisions Lovo routinely made as Process Supervisor, but it was not the only evidence suggestive of Lovo's level of decision-making and is therefore not of significant importance.  Finally, ASR explains that its counsel did not determine that the emails were responsive to Lovo's discovery requests until it prepared its motion for summary judgment.  ECF No. 42, p. 10.  In light of these factors, this Court concludes the non-disclosure was harmless and accordingly declines to strike the two exhibits.

## C. Affidavits

Finally, two affidavits submitted by the parties in support of their motions are the subject of motions to strike.  First, Lovo moves to strike the "Declaration of Kelly DeAngelo" (the "DeAngelo affidavit") submitted by ASR (ECF No. 36-3) in support of its motion for summary judgment.  Second, defendants move to strike the "Statement of Michael Ford" (the "Ford

affidavit") submitted by Lovo (ECF No. 39-13) in support of his response in opposition to ASR's motion for summary judgment.

Under Fed. R. Civ. P. 56(c)(4), an affidavit used to support a motion must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  "[A] court may strike portions of affidavits that lack personal knowledge, contain hearsay, or rest upon conclusory statements." *Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d 520, 527 (D. Md. 2001) (citation omitted).

Additionally, a district court may decline to consider an affidavit under the sham affidavit doctrine.  Under this doctrine, "'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.'" *Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)).  At the summary judgment stage, a court's use of the sham affidavit rule "must be carefully limited to situations involving flat contradictions of material fact." *Id.* (citation and internal quotation marks omitted).

### i. DeAngelo Affidavit

Lovo requests that this Court strike the DeAngelo affidavit submitted by ASR in support of its motion for summary judgment, claiming DeAngelo lacks personal knowledge to support his affidavit.  ECF No. 38-1, p. 26.

DeAngelo's affidavit affirms that he has personal knowledge of the matters to which he testified within the statement.  ECF No. 36-3, Appendix A, ¶ 1.  DeAngelo served as the

Refinery Manger during the relevant period.  *Id.* at ¶ 2.  As the Refinery Manager, he was at the top of the reporting chain: Process Supervisors, like Lovo, reported to Process Managers, like Wooters, who reported to DeAngelo.  *Id.* at ¶¶ 13-16.  DeAngelo's role and duties as the Refinery Manager are sufficient to show that he has personal knowledge to support his affidavit.  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 n. 9 (4th Cir. 2002) ("Bell Atlantic's affidavits contain sufficient information, including a description of the affiant's job titles and duties, to establish that the affiants' statements were made based on personal knowledge." ).  In fact, Lovo personally exchanged emails with DeAngelo regarding the performance of Lovo's job duties.  *See e.g.* ECF No. 36-3, Ex. 1.  Based on DeAngelo's role at ASR, job duties, and personal communications with Lovo about Lovo's job duties, this Court concludes DeAngelo's affidavit was supported by personal knowledge, and Lovo's motion for sanctions is therefore denied.

### ii.  Ford Affidavit

 Defendants move to strike Ford's affidavit on three grounds: (1) Ford did not read the affidavit before signing it, (2) the affidavit is a "sham affidavit" because it is contradicted by Ford's deposition testimony, and (3) Ford failed to comply with certain discovery requests.  ECF No. 48.

Defendants' arguments for striking the Ford affidavit are unpersuasive.  First, Ford, who was employed as a Process Supervisor at ASR during the relevant time period, testified that he "did read [the affidavit]."  He stated, "I actually went through it, scanned through it…I'm aware of what's in it."  ECF No. 48-2, Ford Dep. 93:18-94:1.  Second, the affidavit is not a sham affidavit.  The sham affidavit doctrine applies to affidavits that contradict a party's "own *previous* sworn statement."  *Zimmerman*, 287 F.R.D. at 362 (quoting *Cleveland v. Policy Mgmt.*

*Sys. Corp.*, 526 U.S. 795, 806 (1999)) (emphasis added).  Ford's affidavit was provided to defendants twenty days *prior to* Ford's deposition.  Accordingly, this doctrine has no application here.  Finally, although defendants now allege that Ford failed to comply with discovery requests, defendants never moved to compel disclosure or discovery pursuant to Federal Rule of Civil Procedure 37.  This motion to strike, filed months after discovery closed, is the first time defendants have raised the issue of Ford's non-cooperation with discovery.  Defendants' counsel also failed to confer with plaintiff's counsel to attempt to resolve the discovery dispute and failed to file a certificate as required by Local Rule 104.7.  Therefore, defendants' motion to strike is denied.

## II. Defendants' Motions for Summary Judgment

The FLSA "establishes a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek for many employees."  *Perez v. Mortg. Bankers Ass'n*, _ U.S. _, 135 S. Ct. 1199, 1204 (2015) (citation and internal quotation marks omitted).  Overtime compensation must be paid "at a rate not less than one and half times" the employee's regular rate.  29 U.S.C. § 207.  The requirements of the MWHL mirror those of the FLSA.  *See* MD. CODE ANN., LAB. & EMPL. § 3-401 *et. seq*.  "Thus, [p]laintiff['s] claim under the MWHL 'stands or falls on the success of [his] claim[s] under the FLSA.'"  *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242 (D. Md. 2012) (quoting *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003)).

The FLSA and MWHL overtime compensation requirements do not apply to exempt employees.  29 U.S.C. § 213; MD. CODE ANN., LAB. & EMPL. § 3-403.  Under both the FLSA and the MWHL, those who are employed in a "bona fide executive, administrative, or professional capacity" are exempt employees.  29 U.S.C. § 213(a)(1); MD. CODE ANN., LAB. &

EMPL. § 3-403(1).  At issue here are the executive and administrative exemptions.

Exempt status is an affirmative defense, so the employer must prove, by clear and convincing evidence, that the employee qualifies for an exemption.  *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 691 (4th Cir. 2009).  This determination is a question of law.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  In making this determination, the Supreme Court has recently clarified that exemptions should be given a "fair (rather than a 'narrow') interpretation."  *Encino Motorcars, LLC v. Navarro*, _ U.S._, 138 S. Ct. 1134, 1142 (2018) (citation and internal quotation marks omitted).

The Department of Labor has promulgated regulations interpreting the FLSA exemptions.  Maryland regulations define the relevant exemptions to have the same meanings as under the federal regulations.  MD. CODE REGS. 09.12.41.01, 09.12.41.05.  Under the federal regulations, there are two tests that a plaintiff must satisfy to qualify for either the executive or the administrative exemption: (1) a "salary basis" test, and (2) a "primary duties" test.  *Bonilla v. Dops, Inc.*, No. GJH-14-3055, 2016 WL 828096, at *4 (D. Md. Feb. 29, 2016) (quoting *Altman v. Sterling Caterers, Inc.*, 879 F. Supp. 2d 1375, 1381 (S.D. Fla. 2012)).

The "salary basis" test requires an employee earn a salary exceeding $455 per week.[7]  29 C.F.R. § 541.600.  The "primary duties" test requires that an employee's primary duty be the performance of exempt work.  29 CFR § 541.700(a).  This determination is based on the totality of the circumstances.  *Id.*  Factors to consider include,

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's

---

[7] Although the U.S. Department of Labor amended this regulation to increase the requisite salary level, the U.S. District Court for the Eastern District of Texas enjoined the amended regulation nationwide.  *See Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016).  Thus, $455 per week is the applicable salary test.

> salary and the wages paid to other employees for the kind of nonexempt work
> performed by the employee.

*Id.*  Time spent performing exempt work is also relevant.  Accordingly, "employees who spend

more than 50 percent of their time performing exempt work will generally satisfy the primary

duty requirement."  29 C.F.R. § 541.700(b).  Time, however, is not the sole factor, and

"[e]mployees who do not spend more than 50 percent of their time performing exempt duties

may nonetheless meet the primary duty requirement if the other factors support such a

conclusion."  *Id.*

Defendants contend Lovo qualified for the executive and the administrative exemptions.

It is undisputed that the salary basis test for the exemptions is satisfied.  ASR paid Lovo a salary

in excess of the required $455 per year.  At issue is whether the primary duties test is satisfied for

either or both exemptions.

### A.   Executive Exemption

An employee is an executive if, in addition to meeting the salary test, the employee,

> (1) [has the primary duty of] management of the enterprise in which the employee
> is employed or of a customarily recognized department or subdivision thereof,
> (2) …customarily and regularly directs the work of two or more other employees;
> and
> (3) …has the authority to hire or fire other employees or whose suggestions and
> recommendations as to the hiring, firing, advancement, promotion or any other
> change of status of other employees are given particular weight.

29 CFR § 541.100(a).

### i.   Primary Duty of Management

First, the employee's primary duty must be management of the enterprise or a

customarily recognized department or subdivision.  Management includes,

> activities such as interviewing, selecting, and training of employees; setting and
> adjusting their rates of pay and hours of work; directing the work of employees;
> maintaining production or sales records for use in supervision or control;

appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees on the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 CFR § 541.102. "A customarily recognized department or subdivision must have a permanent status and a continuing function." 29 CFR § 541.103(a). The three divisions of which Lovo served as a Process Supervisor (the dock operations, the Wash House, and the Filter House) undisputedly qualify as customarily recognized departments or subdivisions of ASR.

The evidence shows that Lovo's primary duty as a Process Supervisor was management of these divisions. Lovo's overarching role as Process Supervisor was directing the work of his employees. In dock operations, Lovo was responsible for supervising seventeen to twenty employees, including operators and longshoremen. ECF No. 36-4, Lovo Tr. 87:14-88:6, 90:19-91:13. Lovo himself describes his duties in dock operations as "supervis[ing] [the] entire operation," "supervis[ing] two different labor unions, including ILA (longshoremen)," and "supervis[ing] the discharge operation of bulk ships [and] barges." ECF No. 36-7, p. 2. Lovo's duties also went beyond mere supervision; he was managing, a job that another dock Process Supervisor described as "all-encompassing." ECF No. 51-1, Ford Dep. 145:1-3. Lovo was responsible for "ensuring that [the employees were] doing the job that they [were] supposed to be doing." ECF No. 51-1, Ford Dep. 295:2-10. In accomplishing this, Lovo directed longshoremen, including scheduling gangs of longshoremen, gave longshoremen direction, and executed each ship's sugar discharge plan in a timely manner. ECF No. 51-1, Ford Dep. 212:10-213:2.

Similarly, as Process Supervisor of the Wash House and Filter House, Lovo directed the work of five full-time operators.  ECF No. 36-4, Lovo Tr. 325:6-326:4.  Lovo testified that he was "in charge of the Wash House" and agreed that he was "the boss of the operators in the Wash House."  *Id.* at 144:16-21.  He described his duties in these divisions as "supervi[sing] the floor" while simultaneously "trying to get the work done."  *Id.* at 143:11-17.  Every day, Lovo conducted "walk-throughs" of each floor of the Wash House and Filter House to inspect the divisions, ensure operations were running properly, and locate problems requiring attention.  *Id.* at 208:4-212:6.  In general, Lovo "over[saw] the people" and ensured the department met the requisite production standards.  *Id.* at 175:5-9.  In order to meet production standards, Lovo had to monitor the status of operations, at times requiring him to "do whatever [he] need[ed] to do in order to speed things up."  *Id.* at 131:11-17.

In all three divisions, Lovo was required to specifically plan his employees' work by delegating tasks to employees based on their strengths and weaknesses.  ECF No. 51-1, Ford Dep. 144:15-21.  In fact, Wooters gave Lovo an unsatisfactory performance rating because Lovo failed to delegate more often.  Wooters wrote, "[Lovo] shows little to no delegation ability. [Lovo] struggles to perform supervision duties expected of a Baltimore Supervisor.  [Lovo] often performs operator work instead of delegating or holding operators accountable of [sic] carrying out their duties.  [Lovo] must increase his ability to delegate authority."  ECF No. 39-10.  Lovo contends this performance rating is evidence that Lovo's primary duty was not management because he did not delegate tasks.  Instead, it shows that Lovo's primary duty was management, including delegation, but that Lovo failed to perform his job in accordance with ASR's expectations.  Lovo was "given [a] job[] exempt in nature," and he "cannot build a claim for overtime by failure to perform [that] job correctly."  *Whiteway v. FedEx Kinko's Office & Print*

*Servs., Inc.*, No. C 05-2320 SBA, 2007 WL 2408872, at *10 (N.D. Cal. Aug. 21, 2007), *rev'd on other grounds*, 319 F. App'x 688 (9th Cir. 2009).  *See also Grace v. Family Dollar Stores, Inc.*, No. 3:08 MD 1932, 2012 WL 3191354, at *6 (W.D.N.C. Aug. 3, 2012) (recognizing that "an employee's failure to perform certain duties in accordance with an employer's reasonable expectations" may not defeat the employee's status as an exempt employee).

Lovo's management duty also included activities other than directing employees.  He had authority to discipline employees in the form of coaching and oral or written warnings under ASR's progressive discipline model.  ECF No. 36-4, Lovo Tr. 138:17-139:19.  *See Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 630 (E.D. Tex. 2008), *aff'd*, 314 F. App'x 693 (5th Cir. 2009) (even though "[p]laintiffs could not directly discipline employees," it was sufficient for the purposes of the executive exemption that plaintiffs could initiate the progressive discipline process).  Lovo did in fact issue at least one warning to an employee under his supervision.  ECF No. 36-8, Wooters Decl. ¶ 6.  In addition to disciplining employees, Lovo was responsible for investigating incidents and recommending further discipline.  ECF No. 36-5, Moore Decl. ¶ 8. On at least one occasion, Lovo attended and testified at a grievance hearing related to an incident concerning two longshoremen on the dock.  *Id.*

Staffing and working hours were also within Lovo's purview as Process Supervisor.  The production goals at times required Lovo to recommend adjustments to employees' hours of work, such as recommending employees start early or work overtime.  ECF No. 36-4, Lovo Tr. 287:2-6.  Lovo also had to order longshoremen crews from their union on a daily basis.  *Id.* at 278:8-11.  For most ships, a standard number of crews were ordered, but certain ships required Lovo to request additional laborers.  *Id.* at 278:12-279:13; ECF No. 51-1, Ford Tr. 214:7-18.

Those requests were always granted.  ECF No. 36-4, Lovo Tr. 279:14-17.  Lovo monitored

employee time records as well.  *Id.* at 287:10-289:7.

Additionally, Lovo was responsible for monitoring and enforcing safety compliance.  *Id.*

at 159:16-17.  Part of this role was the performance of safety contacts, where Lovo would

observe an employee performing a task and instruct the employee as to how the employee could

have performed the task more safely.  *Id.* at 166:1-169:2; ECF No. 36-3, DeAngelo Decl. ¶ 58.

Lovo was also responsible for conducting monthly trainings, including trainings on safety.  ECF

No. 36-3, DeAngelo Decl. ¶ 59; ECF No. 36-4, Lovo Tr. 292:17-293:3.  Although the content of

the trainings was established by ASR, Lovo, as a Process Supervisor, had discretion to set the

time and manner of the trainings.  ECF No. 36-3, DeAngelo Decl. ¶ 59.  *See Burson v. Viking*

*Forge Corp.*, 661 F. Supp. 2d 794, 801 (N.D. Ohio 2009) ("The fact that the training plaintiff

was to provide…was governed by existing company policies…does not transform plaintiff's

duties into ones that are not managerial in nature.").

In addition to safety compliance, Lovo monitored environmental policy compliance.

Specifically, Lovo was responsible for minimizing sucrose loss in the refining process.  ECF No.

36-4, Lovo Tr. 178:7-18.  Excessive sucrose loss can cause waste water to drain into the harbor,

creating environmental concerns.  ECF No. 36-3, DeAngelo Decl. ¶ 56.  General quality control

was also Lovo's duty.  As stated above, Lovo had to ensure production standards were met.  ECF

No. 36-4, Lovo Tr. 175:7-9.  Lovo also prepared numerous types of reports used by ASR to

monitor its operations and ensure quality control.  *Id.* at 267:6-270:12; ECF No. 36-3, DeAngelo

Decl. ¶ 44.  When a problem or incident occurred, Lovo conducted a "three step" process, which

involved (1) identifying the problem, (2) determining the cause of the problem, and (3) making

recommendations for improvements to prevent the problem from occurring again.  ECF No. 36-

4, Lovo Tr. 173:2-174:4.  In once such three-step conducted by Lovo, ASR in fact adopted his

recommendation of installing an eye wash station to prevent incidents in the future.  *Id.* at 187:2-

188:14; ECF No. 36-3, DeAngelo Decl. ¶ 54.

Lovo also decided techniques to use to discharge the sugar.  ECF No. 36-3, DeAngelo

Decl. ¶ 33.  Although Lovo claims he simply followed a discharge plan set by the ship, Lovo

once emailed DeAngelo a description of the techniques he used to speed up discharge of one

ship.  ECF No. 36-4, Lovo Tr. 88:20-89:17; ECF No. 36-3, Ex. 1.  He wrote, "I opened the

feeder gate all the way on #1 crane since this is good digging sugar…We also had equipment

bouncing from hold to hold in order to keep sugar available for cranes to dig."  ECF No. 36-3,

Ex. 1.  This email evidences Lovo's decision-making with regard to technique.  *See e.g. Rock v.*

*Sunbelt Cranes, Constr. & Hauling, Inc.*, 678 F. Supp. 2d 1264, 1269 (M.D. Fla. 2009), *aff'd*

*sub. nom.*, *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875 (11th Cir. 2010) (finding crane

dispatcher's primary duty was management based in part on dispatcher's responsibility of

"determin[ing] the type of materials, supplies, machinery, equipment or tools to be used with the

cranes").

In addition to these duties, Lovo performed manual labor.  *See e.g.* ECF No. 39-3, Lovo

Tr. 215:20-216:10.  As an initial matter, Wooters' performance evaluation suggests Lovo

performed more manual labor than he should have as Process Supervisor.  ECF No. 39-10

("[Lovo] often performs work himself rather than delegate down or hold operators accountable

to perform their duties.").  Even assuming, however, that Lovo's position required the

performance of manual labor, he is not disqualified from the executive exemption.  The

regulations state, "Concurrent performance of exempt and nonexempt work does not disqualify

an employee from the executive exemption if the requirements of § 541.100 are otherwise met."

29 CFR § 541.106(a).

The U.S. Court of Appeals for the Fourth Circuit has found that even an employee who

devotes most of her time to "doing the mundane physical activities necessary for [the business's]

successful operation" can qualify for the executive exemption if she was "performing

management duties" simultaneously. *In re Family Dollar FLSA Litigation*, 637 F.3d 508, 517

(4th Cir. 2011). Similarly here, although Lovo devoted time to manual labor necessary to make

the refinery's operations successful, "he does not appear to dispute that he normally supervised

[multiple] people at any given time." *See Cooper v. Drexel Chem. Co.*, 949 F. Supp. 1275, 1281

(N.D. Miss. 1996). In other words, "while [Lovo] was working with the crew, he was

simultaneously supervising and directing other employees." *See Buechler v. DavCo Rests., Inc.*,

No. WDQ-09-0227, 2009 WL 3833999, at *5 (D. Md. Nov. 16, 2009). Therefore, the evidence

shows Lovo's primary duty was still management, even though he also spent time on manual

labor.

Lovo attempts to escape the conclusion that his primary duty was management by

characterizing his primary job duty as "communicating upper management's orders to

individuals working as operators" and arguing that ASR had established work procedures for

every task applicable to his operations. ECF No. 39, p. 4; ECF No. 39-3, Lovo Tr. 137:21-

138:11 ("For every job, there's a…procedure. [E]verything is written in stone. All they have to

do is follow that."). Courts have rejected these types of arguments. For example, in a case

involving an assistant manager at a fast food restaurant, this Court found the manager to be an

exempt employee, even though the manager "was required to adhere to certain guidelines or in

certain instances obtain the Store Manager's approval." *Buechler v. DavCo Rests., Inc.*, No.

WDQ-09-0227, 2009 WL 3833999, at *6 (D. Md. Nov. 16, 2009) (citation and internal quotation marks omitted).

Similarly, in a case before the U.S. District Court for the Eastern District of Michigan, a production supervisor argued he did not qualify for the executive exemption because the facility in which he worked was a "closely controlled environment" which limited "the discretion exercised by supervisors in carrying out their oversight function." *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1017 (E.D. Mic. 2005). In rejecting this argument, the court wrote, "nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'" *Id.* In fact, the court found, "'[e]nsuring that company policies are carried out constitutes the very essence of supervisory work.'" *Id.* (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982)) (alteration in original). Accordingly, it is sufficient that Lovo, as a Process Supervisor "carr[ied] out management functions by training workers to perform their tasks in accordance with [company] standard[s] and other corporate policies and practices, and [ensured] that the employees in [his] charge actually [met those] standards in their daily work." *Id.*

Even viewing the evidence in the light most favorable to Lovo, the activities for which he was responsible—including directing employees, supervising employees and the entire operation, directing union workers, delegating tasks, imposing progressive discipline, adjusting staffing and working hours, monitoring and enforcing safety compliance, overseeing quality control, preparing reports, offering recommendations to prevent incidents, and deciding what techniques to use—compel the conclusion as a matter of law that Lovo's primary duty was management. *See e.g. Burson v. Viking Forge Corp.*, 661 F. Supp. 2d 794, 803 (N.D. Ohio

2009) (finding shift supervisor who "interviewed and hired employees, made adjustments to the shift's work schedule as needed, decided whether to grant vacation requests, evaluated his employees' performances, trained his employees in proper safety procedures, administered discipline, and resolved employee complaints" satisfied executive exemption).

### i. Directing Two or More Other Employees

Second, the employee must customarily and regularly direct the work of two or more other employees. "'[T]wo or more other employees' means two full-time employees or their equivalent." 29 CFR § 541.104(a). Lovo satisfies this requirement. As discussed above, Lovo supervised seventeen to twenty employees as Process Supervisor of the dock operations and five full-time employees as Process Supervisor of the Wash House and Filter House. ECF No. 36-4, Lovo Tr. 87:14-88:6, 90:19-91:13, 325:6-326:4. There is ample evidence that Lovo's supervision duties involved directing the employees he supervised. *See supra* Analysis, Section II.A.i.

### ii. Authority to Hire or Fire Other Employees

Finally, the employee must either have the authority to hire or fire other employees or have particular weight given to their suggestions and recommendations as to changes in status of other employees. 29 CFR § 541.100(a)(4). Defendants do not dispute that Lovo lacked authority to hire or fire employees, but contend that Lovo's suggestions and recommendations were given particular weight.

> To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 CFR § 541.105.

Viewing the evidence in the light most favorable to Lovo, there is no genuine dispute of material fact that Lovo's suggestions and recommendations were given particular weight.  First, Lovo was responsible for ordering longshoremen crews on a daily basis.  Although this responsibility did not involve selecting individual longshoremen through a hiring process, Lovo did make decisions regarding how many crews to order and had the authority to request specific longshoremen not be re-hired.  ECF No. 39, p. 16 ("Mr. Lovo had the ability to…submit a request that a certain longshoremen not be permitted to return for future assignments.")  For example, another Process Supervisor of the dock operations did submit requests that particular longshoremen not be sent back to the Refinery, "effectively terminat[ing] their employment with ASR."  ECF No. 36-3, DeAngelo Decl. ¶ 30.

Apart from ordering longshoremen crews, Process Supervisors are involved in the hiring process for "Process Supervisor" job openings.  Most openings are filled with employees from other departments through an internal bid process.  *Id.* at ¶ 43.  When job openings cannot be filled this way, Process Supervisors review resumes, make recommendations for interviews, participate in interviews, and make recommendations for hiring.  *Id.*; ECF 39-5, Wooters Tr. 81:1-82:5.  Although no job openings had to be filled in this manner while Lovo was Process Supervisor, ASR did in fact give their Process Supervisors' recommendations particular weight when Process Supervisors participated in the hiring process.  ECF 39-5, Wooters Tr. 82:6-16. For example, when Wooters was a Process Supervisor, ASR had to hire two external candidates. ASR hired the applicants recommended by Wooters.  ECF No. 36-8, Wooters Decl. ¶ 7.  This concrete evidence of the particular weight given to Process Supervisors' recommendations allows this Court to avoid "impermissibl[e] speculat[ion]" as to this issue.  *See Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 906 (8th Cir. 2014) (finding it was insufficient that

the employer "assert[ed] that he *would have* involved the plaintiffs more if had hired more employees" because "it require[d] the jury to impermissibly speculate and rely on intended rather than actual job functions").

In addition to involving Process Supervisors in external hiring, ASR held Process Supervisors responsible for training and evaluating new hires.  ECF No. 36-8, Wooters Decl. ¶ 9.  All new employees were evaluated by their Process Supervisor weekly for six weeks.  *Id.*  After the six week training period, the Process Supervisor had to make a recommendation as to whether the employee should be retained in the position.  *Id.*  At any time during the six weeks, the Process Supervisor could determine the employee was unqualified.  If such a determination was made, the employee would not be retained.  *Id.* ("For example, when I worked as a Process Supervisor…, I rated an employee as not qualified at the conclusion of her six week training period…Because I rated her as not qualified, she did not remain in the…position.").  The responsibility given to Process Supervisors to determine whether a new employee would become a permanent employee, especially when coupled with the role of Process Supervisors in initiating the progressive discipline process, evidences that ASR gave particular weight to their suggestions as to the status of employees.  *See Rainey*, 552 F. Supp. at 632 (finding "[p]laintiffs['] suggestions and recommendations as to whether an employee would become permanent, transfer departments, and receive discipline" satisfied this element).

Process Supervisors also had the responsibility of notifying upper management that a new employee was needed.  As Wooters testified, "[Lovo] would have the authority to say we need a person in a job position."  ECF No. 39-5, Wooters Tr. 82:17-21.  Additionally, Lovo could submit suggestions to ASR regarding hiring and firing of employees.  ECF No. 39-11, Lovo Decl. ¶ 7.  Making such suggestions did not happen frequently, but ASR did give significant

weight to such suggestions by Process Supervisors.  *Id.*; ECF No. 36-3, DeAngelo Decl.  ¶¶ 63-64 ("[I]f a Process Supervisor recommended against promoting an employee under his or her supervision, ASR would not likely promote that individual.").   For example, when DeAngelo worked as Process Supervisor at the Refinery, she recommended an employee be suspended from work, and ASR followed her recommendation.  ECF No. 36-3, DeAngelo Decl. ¶ 63. Overall, the evidence in its totality demonstrates that particular weight was given to Lovo's suggestions and recommendations so as to satisfy this element.  Thus, Lovo was exempt from the FLSA and MWHL overtime requirements as an executive employee.

### B.  Administrative Exemption

An employee qualifies for the administrative exemption if, in addition to meeting the salary requirement:

> (1) [the employee's] primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (2) [the employee's] primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 CFR § 541.200(a).

### i.  Work Directly Related to Management or Business Operations

First, the employee's primary duty must be performing work directly related to the management or general business operations.  29 CFR § 541.200(a).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 CFR § 541.201(a).  This work includes, but is not limited to:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing;

research; safety and health; personnel management; human resources; employee
benefits; labor relations; public relations, government relations; computer
network, internet and database administration; legal and regulatory compliance;
and similar activities. Some of these activities may be performed by employees
who also would qualify for another exemption.

29 CFR § 541.201(b).

Lovo's primary duty was performing work directly related to management.  First, Lovo

had extensive personnel management responsibilities.  As discussed with respect to management

under the executive exemption analysis, Lovo supervised 17-20 employees as Process Supervisor

of the dock operations and 5 full-time operators as Process Supervisor of the Wash House and

Filter House.  He was responsible for ensuring the employees under his supervision followed

company policies and procedures.  ECF No. 36-4, Lovo Tr. 208:4-212:6.  Lovo could also

initiate the progressive discipline process.  *Id.* at 138:17-139:19.  If a new hire started in his

department, Lovo would have been in charge of evaluating the employee and making a

recommendation as to whether the employee should become permanent.  ECF No. 36-8, Wooters

Decl. ¶ 9.  Lovo coordinated trainings for his employees on topics including safety and quality

control.  ECF No. 36-3, DeAngelo Decl. ¶ 59; ECF No. 36-4, Lovo Tr. 292:17-293:3.

Additionally, Lovo had payroll and timekeeping responsibilities; he was responsible for inputting

his employees' schedules and monitoring their time logs to ensure they reported their work hours

accurately.  ECF No. 36-4, Lovo Tr. 287:10-289:7.  These personnel responsibilities qualify as

work directly related to management.  *See e.g. Lane v. Sys. Application & Techs., Inc.*, No.

DKC-13-3566, 2015 WL 1013449, at *9 (D. Md. March 6, 2015) (finding plaintiff's supervisory

duties such as "approv[ing] requests for leave, advis[ing] them about company policy, and

assign[ing] them work" relevant to concluding plaintiff satisfied administrative exemption).

In addition to personnel management responsibilities, Lovo's primary duty included labor

relations.  He supervised a unionized workforce of longshoremen.  As part of this duty, Lovo had

to communicate with the union to address issues.  He also investigated an incident involving two

longshoremen and testified at a grievance hearing regarding the incident on ASR's behalf.  ECF

No. 36-5, Moore Decl. ¶ 8.

Lovo's responsibilities also included quality control.  In his own words, his "main focus

[was] trying to meet production standards."  ECF No. 36-4, Lovo Tr. 175:7-9.  To do so, he had

to monitor the refining process, at times making adjustments, to ensure a satisfactory output.  *Id.*

at 175:7-9, 178:7-18.  Lovo also prepared reports on which ASR relied to ensure operations were

running efficiently.  *Id.* at 267:6-270:12; ECF No. 36-3, DeAngelo Decl. ¶ 44.  Additionally,

Lovo's primary duty included safety work, such as training on safety, enforcing safety policies,

performing inspections and safety contacts, and conducting three-step processes in response to

incidents.  ECF No. 36-4, Lovo Tr. 159:16-17, 166:1-169:2, 173:2-174:4, 292:17-293:3; ECF

No. 36-3, DeAngelo Decl. ¶¶ 58-59.

Lovo again attempts to use his performance of manual labor to escape this exemption.

Where an employee performs both non-managerial work and managerial work, "imagin[ing]

how the [business] would function if the employee did not perform [his] non-managerial or

managerial functions, alternatively" can be helpful in determining the employee's primary duty.

*Pierce v. Dolgencorp, Inc.*, Nos. 3:09cv079, 4:09cv097, 2011 WL 398366, at *8 (M.D. Pa. Feb.

3, 2011).  Wooters' performance evaluation stated that Lovo should have been performing fewer

non-managerial functions, suggesting that if Lovo had ceased to perform his non-managerial

functions and delegated them to his employees instead, the Refinery would have continued to

function properly.  *See* ECF No. 39-10.

If Lovo did not perform his managerial functions, however, the Refinery would have experienced serious problems.  For example, dock operations would not have been staffed properly, the discharge of ships would not have proceeded on schedule, the production goals would not have been met on time, and unsafe conditions would have resulted without anyone monitoring safety compliance.

Courts have found employees with similar job duties to be exempt administrative employees.  *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 373 (7th Cir. 2005) (nuclear plant planners qualified for administrative exemption where their duties included "guid[ing] other employees to make sure that work packages [were] implemented efficiently and tasks [were completed on time]"); *Lane v. Sys Application & Techs., Inc.*, No. DKC-13-3566, 2015 WL 1013449, at *9 (D. Md. March 6, 2015); *Stricker v. Eastern Off Road Equipment, Inc.*, 935 F. Supp. 650, 657 (D. Md. 1996) (store manager qualified for administrative exemption in part because of his supervisory responsibilities such as "the authority to warn and discipline the assistant manager," the authority to "recommend the assistant manager's termination or suspension," and the "responsibil[ity] for drafting his employee's work schedule, as well as his own").  Accordingly, the evidence shows that Lovo's primary duty was his managerial work, not the manual labor in which he engaged.

### ii.  Discretion and Independent Judgment

Second, the employee must exercise discretion and independent judgment respecting matters of significance.  29 CFR § 541.202(a).  "In general, the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work

performed." *Id.*  In deciding whether an employee exercises discretion and independent

judgment, courts can consider factors including,

> whether the employee has authority to formulate, affect, interpret, or implement
> management policies or operating practices; whether the employee carries out
> major assignments in conducting the operations of the business; whether the
> employee performs work that affects business operations to a substantial degree,
> even if the employee's assignments are related to operation of a particular
> segment of the business; whether the employee has authority to commit the
> employer in matters that have significant financial impact; whether the employee
> has authority to waive or deviate from established policies and procedures without
> prior approval; whether the employee has the authority to negotiate and bind the
> company on significant matters; whether the employee provides consultation or
> expert advice to management; whether the employee is involved in planning long-
> or short-term business objectives; whether the employee investigates and resolves
> matters of significance on behalf of management; and whether the employee
> represents the company in handling complaints, arbitrating disputes or resolving
> grievances.

29 CFR § 541.202(b).

> To qualify for this exemption, an employee need not have unfettered discretion:

> [E]mployees can exercise discretion and independent judgment even if their
> decisions or recommendations are reviewed at a higher level….The fact that an
> employee's decision may be subject to review and that upon occasion the
> decisions are revised or reversed after review does not mean that the employee is
> not exercising discretion and independent judgment.

29 CFR § 541.202(c).  The employee must, however, do more than "apply[] well-established

techniques, procedures or specific standards described in manuals or other sources."  29 CFR §

541.202(e).

Lovo's primary duty involved the exercise of discretion and independent judgment

regarding significant matters.  In the area of personnel management, Lovo set schedules, directed

his employees' day-to-day work, and determined when employees should work overtime.  *See*

*supra* Analysis, Section II.A.i.  He had the discretion to initiate the progressive discipline

process.  He had authority to make recommendations as to staffing levels, and he could exercise

independent judgment in supervising and evaluating new hires.  *See supra* Analysis, Section

II.A.i-iii.  Additionally, Lovo had the discretion to set his own schedule.  ECF No. 36-8, ¶ 5.  *See*

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330 (5th Cir. 2000)

(characterizing plaintiff's ability to set her own work schedule as exercising independent

judgment).

Lovo also exercised discretion and independent judgment in his decisions regarding

techniques and quality control.  For example, he exercised his independent judgment in

discharging raw sugar from ships.  Although he largely followed pre-set discharge plans, he also

made decisions to improve the efficiency of the discharge.  ECF No. 36-3, Ex. 1.  Similarly, in

the refining process, he used his discretion to minimize sucrose loss and to meet production

standards.  ECF No. 36-4, Lovo Tr. 178:7-18, 175:7-9.  Additionally, Lovo exercised discretion

in ordering longshoremen crews each day and in communicating with the union to address

issues.  *See supra* Analysis, Section II.A.i.  Lovo also had responsibilities for resolving

grievances concerning the longshoremen.  *See id.*

Significant evidence showing Lovo's exercise of discretion and independent judgment

includes Lovo's responsibility for conducting safety contacts and three-step processes.  As

discussed previously, the purpose of safety contacts was to instruct employees on how to

perform tasks in a safer manner.  *See supra* Analysis, Section II.A.i.  This responsibility required

Lovo use his independent judgment to determine how safety could be improved with regard to

specific tasks.  Similarly, the three-step processes required Lovo use his independent judgment to

make recommendations as to how to prevent incidents in the future.  *See supra* Analysis, Section

II.A.i; *Kennedy*, 410 F.3d at 375 (reasoning that "when [employees found] a problem, they

propose[d] an appropriate remedy" was relevant to concluding the employees exercised discretion and independent judgment).

Lovo argues he does not qualify for the administrative exemption because he was simply enforcing work procedures that were "written in stone." ECF No. 39-3, Lovo Tr. 137:21-138:11. Courts have not found this type of argument persuasive. For example, in a case concerning nuclear power plant employees, the U.S. Court of Appeals for the Seventh Circuit stated,

> The plaintiffs make the general argument that because a nuclear power plant is an exceedingly regulated workplace-as they put it, 'procedure-driven, routine, and strictly controlled'-there was no room for any of the plaintiffs to exercise independent judgment. We disagree…While the plaintiffs' discretion may be channeled by the regulations that apply to this industry, that does not mean [plaintiffs] do not exercise independent judgment.

*Kennedy*, 410 F.3d at 374. Similarly here, Lovo's primary duty involved exercising discretion and independent judgment in executing his job functions, despite the fact that many procedures were pre-determined by ASR. Thus, Lovo qualifies for the administrative exemption from the FLSA and MWHL overtime requirements.

### C. Maryland Wage Payment and Collection Law ("MWPCL") Claim

The MWPCL is a vehicle for employees to recover "any *unlawfully* withheld overtime wages." *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621,626 (Md. 2014) (emphasis added). Because this Court concludes Lovo was an exempt employee under the FLSA and MWHL, overtime wages were not unlawfully withheld. Thus, summary judgment is granted in favor of defendants on plaintiff's MWPCL claim. *See Lockley v. Town of Berwyn Heights*, No. JFM-14-825, 2015 WL 5334256, at *14 (D. Md. Sept. 11, 2015) (granting defendant's motion for summary judgment on MWCPL claim where plaintiff was not entitled to overtime pay because he was an exempt employee).

### III. Plaintiff's Motion for Partial Summary Judgment

Lovo has also sought partial summary judgment against Wooters on the issue of whether Wooters was Lovo's employer for the purposes of the Fair Labor Standards Act ("FLSA"), the Maryland Wage and Hour Law ("MWHL"), and the Maryland Wage Payment and Collection Law ("MWPCL").  ECF No. 40.  Even if Lovo did not qualify for the executive and administrative exemptions from the FLSA and MWHL overtime requirements, his motion for partial summary judgment against Wooters is denied as Wooters is not an employer under either statute.

### A.  Wooters' Status as an "Employer" Under the FLSA and MWHL

The FLSA and MWHL define "employer" as, "any person acting directly or indirectly in the interest of an employer in relation to an employee…."  29 USC § 203(d); MD. CODE ANN., LAB. & EMPL. § 3-401(b).  To determine whether an individual is an "employer" under both statutes, courts analyze "the economic realities of the relationship between the employee and the putative employer."  *Caseres v. S & R Mgmt. Co., LLC*, No. AW-12-1358, 2012 WL 5250561, at *3 (D. Md. Oct. 24, 2012); *Campusano v. Lusitano Constr. LLC*, 56 A.3d 303, 308 (Md. App. 2012).

Under this test, "an 'employer' is someone who (1) has the authority to hire and fire employees; (2) supervises and controls work schedules or employment conditions; (3) determines the rate and method of payment; and (4) maintains employment records."  *Caseres*, 2012 WL 5250561, at *3 (citations and internal quotation marks omitted).  Other relevant factors include "the person's job description, his or her financial interest in the enterprise, and whether or not the individual exercises control over the employment relationship."  *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D. Md. 2011).  This analysis should examine the totality of

the circumstances; no one factor is dispositive.  *Caseres*, 2012 WL 5250561, at *3 (citations

omitted).  Additionally, the definition of "employer" should be "interpreted broadly to achieve

Congress's intent to provide a remedy to employees for their employers' wage and hour

violations."  *Gionfriddo*, 769 F. Supp. 2d at 890.

Performing the economic realities test reveals that Wooters is not an employer under the

FLSA or the MWHL.  Although Wooters has some hiring authority, his authority over firing is

limited to making recommendations that are subject to review by the Refinery Manager and the

Human Resources Manager.  ECF No. 40-8, Wooters Tr. 47:19-49:2.  Additionally, Wooters has

no role in determining the rate or method of payment for any ASR employees and maintains no

employment records.  ECF No. 37-3, Wooters Decl. ¶¶ 7, 12.  Wooters also has no financial

interest in ASR other than as an employee.  ECF No. 37-3, Wooters Decl. ¶ 6.  These facts weigh

strongly against finding Wooters to be an employer.

Wooters does exercise supervisory and managerial responsibilities, including the direct

supervision of Lovo for part of Lovo's employment, but such responsibilities only show that

Wooters is a mid-level manager without sufficient control to qualify him as an employer.  *See*

ECF No. 40-8, Wooters Tr. 46:1-4.  For example, in a recent case, this Court found that a

restaurant's general manager was not an employer under the FLSA where the general manager

had similar responsibilities to those of Wooters.  *See Montgomery v. Iron Rooster-Annapolis,*

*LLC*, No. RDB-16-3760, 2017 WL 1048260 (D. Md. March 20, 2017).  In that case, the general

manager, "supervis[ed] [the plaintiff's] work; review[ed] reports reflecting the number of hours

[the plaintiff] worked; monitor[ed] and control[ed] labor costs; set[] and/or approv[ed] [the

plaintiff's] work schedule, and otherwise perform[ed] management functions associated with

Iron Rooster's employment relationship with [the plaintiff]."  *Id.* at *1.

Despite these responsibilities, this Court concluded the general manager was not an

employer because the general manager was "at all times subject to [the Iron Rooster's] ultimate

managerial control" and there was "no indication that [the general manager] had any financial

interest in the Iron Rooster other than as an employee." *Id.* at *3. Similarly here, although

Wooters supervised Lovo and has other similar responsibilities, Wooters is at all times subject to

the ultimate managerial control of his superiors at ASR and holds no equity in ASR.

Wooters' status as a mid-level manager distinguishes this case from nearly all of the

cases cited by Lovo. Those cases involved individuals who were corporate owners, high-level

executives, or managers with human resources and payroll authority. *See e.g.*

*McFeeley v. Jackson Street Entm't, LLC*, 47 F. Supp. 3d 260, 275 (D. Md. 2014) (finding that

the *sole owner* of the corporate defendants was an employer under the FLSA) (emphasis added);

*Speert v. Proficio Mortg. Ventures, LLC*, No. JKB-10-718, 2011 WL 2417133, at *4 (D. Md.

June 11, 2011) (denying motion for summary judgment by a bank branch manager who had

authority to hire and fire and approved payroll and commission payments); *Pearson v. Prof'l 50

States Prot., LLC*, No. RDB-09-3232, 2010 WL 4225533, at *3 (D. Md. Oct. 26, 2010) ("This

Court has previously held that there is clear legal authority for the imposition of personal liability

on a *corporate officer* that exercises a high level of control for the FLSA violations of a

corporation.") (emphasis added). Because Wooters lacked such high-level authority in his role at

ASR, he cannot be classified as an employer under the FLSA or MWHL.

### B. Wooters' Status as an "Employer" Under the MWPCL

The MWPCL defines "employer" as "any person who employs an individual." MD.

CODE ANN., LAB. & EMPL. § 3-501(b). "This definition is 'narrower' than the definition of

employer under the FLSA, in that it does not include individuals who act 'indirectly in the

interest of an employer.'" *Alvarez-Soto v. B. Frank Joy, LLC*, 258 F. Supp. 3d 615, 631 (D. Md. 2017) (quoting *Hall v. DIRECTV, LLC*, 846 F.3d 757, 775 n. 10 (4th Cir. 2017)).  Because Wooters is not an "employer" under the broader definitions of the FLSA and MWHL, he is not an employer under the narrower definition of the MWPCL.  *See also Watkins v. Brown*, 173 F. Supp. 2d 409, 415-16 (D. Md. 2001) ("The plain language, general purpose and clear intent of the MWPCL do not support an interpretation of the word 'employer' that would include a mere supervisor of another employee.").  Accordingly, even if Lovo was not an exempt employee under the FLSA and MWHL, this Court would still be compelled to grant Wooters' motion for summary judgment (ECF No. 37) and deny Lovo's motion for partial summary judgment (ECF No. 40).

## CONCLUSION

For the aforementioned reasons, defendants' motions for summary judgment (ECF No. 36, 37) are granted, and plaintiff's motion for partial summary judgment (ECF No. 40) is denied. Plaintiff's motion for sanctions (ECF No. 38) and defendants' motion to strike (ECF No. 48) are denied.  A separate order follows.


  August 17, 2018                                              /s/
Date                                                      Richard D. Bennett
                                                         United States District Judge